**[PUBLISH]**

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

_____

**No. 96-4433**
_____

D.C. Docket No. 94-262-CR-HIGHSMITH


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

    versus

WALTER HERNANDEZ, SR.,
ANTONIO HERNANDEZ, SR., et al.,

                                        Defendant-Appellants.
----------------------------
Appeals from the United States District Court
for the Southern District of Florida
--------------------------
**(May 21, 1998)**

Before ANDERSON and CARNES, Circuit Judges, and O'KELLEY [*], Senior District Judge.
CARNES, Circuit Judge:

---

   *Honorable William C. O'Kelley, Senior U.S. District Judge for the Northern District of Georgia, sitting by designation.

After a five-week trial, a jury convicted five members of the Hernandez family of various charges related to the 1989 murder-for-hire of the night watchman at their family business' warehouse, the burning of that warehouse, and the ensuing fraud on the warehouse's insurer. The district court sentenced three of them to life imprisonment as a result of their convictions for the murder-for-hire, and sentenced the other two to ten years imprisonment because of their roles in the conspiracy to commit the murder-for-hire.

On appeal, the Hernandezes raise numerous claims. However, only the following three claims warrant any discussion: (1) Walter Hernandez, Jr.'s challenge to his conviction on the grounds that his Sixth Amendment Confrontation Clause and Compulsory Process Clause rights were violated when the district court refused to force his father, Walter Hernandez, Sr. to retake the witness stand; (2) Walter Hernandez, Jr.'s challenge to his sentence, in which he contends that the district court had insufficient evidence to conclude that he was guilty of the conspiracy to commit murder-for-hire, and therefore, under § 1B1.2(d) of the United States Sentencing Guidelines, the district court should have considered arson to be his underlying offense; and (3) Antonio Hernandez, Jr., Antonio Hernandez, Sr., and Walter Hernandez, Sr.'s challenge to their convictions for murder-for-hire, in which they contend that the government did not prove that the murder was committed in return for anything of pecuniary value.

We hold that any error the district court may have made by refusing to allow Walter Hernandez, Jr. to present further testimony from Walter Hernandez, Sr. was harmless beyond a reasonable doubt, and therefore affirm his conviction. We agree with Walter Hernandez,

2

Jr.'s contention that there was insufficient evidence to support the district court's finding that he was guilty of conspiracy to commit murder-for-hire. We therefore vacate his sentence and remand to the district court for resentencing. Finally, we conclude that because there was testimony that Antonio Hernandez, Sr. and Antonio Hernandez, Jr. committed the murder with the expectation that Walter Hernandez, Sr. would pay them for that murder, there was evidence to support the convictions of all three of them for murder-for-hire.

## I. FACTS

The facts of this case weave a tale of murder, arson and deceit. In the fall of 1989, Walter Hernandez, Sr.'s ("Walter Sr.") business, Optical Manufacturing Corporation ("OMC"), was in poor financial condition. Over the prior two years, OMC had "bounced" checks in the amount of approximately $215,000. The Internal Revenue Service put a lien on OMC for nonpayment of payroll taxes. In the spring of 1989, OMC's insurance policy and alarm system were canceled due to its failure to pay bills. By September 1989, OMC owed more than $13,000 in back rent and its landlord began eviction proceedings. OMC was not only down, but very nearly out. It was essentially dormant, desperately needing capital to continue its operations.

Despite its poor financial condition, OMC began taking steps to protect its "assets." On October 26, 1989, OMC purchased a $1.5 million insurance policy on its business and its inventory, another $300,000 in liability insurance, and $150,000 in business interruption insurance, all from Orion Insurance ("Orion"). That fall, OMC also employed Orlando Hernandez ("Orlando") as a night watchman. Orlando was the one Hernandez who was not

3

related to the others, which would prove to be a fatal distinction. Orlando took up residence on the second floor of the OMC warehouse, which like he was doomed.

Soon after Orlando was hired, William Hernandez ("William"), one of Walter Sr.'s sons, came to the Maryland home of Lerida Baldo Tappan to meet with Antonio Hernandez, Sr. ("Antonio Sr.") and Antonio Hernandez, Jr. ("Antonio Jr."), Walter Sr.'s brother and nephew, respectively. At that meeting, and in Ms. Tappan's presence, Antonio Sr. told William and Antonio Jr. that Walter Sr. had asked them to go to Miami to "do a job." The "job," as Antonio Sr. revealed, involved blowing up a warehouse in Miami and getting rid of the man who was taking care of it. Antonio Sr. told the others that they would get a good amount of money in return for completing the "job." Antonio Sr. then asked Ms. Tappan if he could borrow her car to drive down to Miami. Instead of just letting him borrow the car, she accompanied him in it to Miami.

Soon thereafter, William stole a pickup truck and attached Ms. Tappan's old license plates to it. Antonio Sr. obtained some plumbing pipes and gave them to Antonio Jr. and William, who put them in a tool box in the back of the truck. Antonio Jr. and William took one of Ms. Tappan's two cellular phones with them in the truck, while Antonio Sr. and Ms. Tappan took the other one in Ms. Tappan's car. The four drove to Miami over the course of the next three days, making frequent cellular phone calls between the car and the truck.

Upon their arrival in Miami, Antonio Sr. and Ms. Tappan went to the warehouse and "checked it out." While they were there, Antonio Sr. introduced Ms. Tappan to Orlando. They proceeded to Walter Sr.'s home in Hialeah, Florida, where they stayed with Walter Sr.,

4

Walter Jr., Wilfredo Hernandez ("Wilfredo") -- Walter's third son -- , William, and Antonio Jr. For several days, Ms. Tappan and Antonio Sr. stayed in Walter Sr.'s house, sharing a bedroom facing the back of the house.

The Hernandez clan worked out the logistics of Orlando's murder at Walter Sr.'s house. During discussions, Walter Sr. explained that Orlando had too much information -- he "knew too much" -- and that Orlando had talked to too many people. Antonio Sr. said that they had to get rid of him. Antonio Jr., Walter Jr., Wilfredo and William were also parties to these conversations, although it is unclear what role each played in the discussion. At one point, Antonio Jr. and William said they were "going to shoot Orlando up further than the moon." Wilfredo later told Ms. Tappan that he had to kill Orlando in order to prove to his father that he was a man.

On the night of November 26, 1989, Antonio Jr., Wilfredo, and William left Walter Sr.'s house in the pickup truck. Late that night, they returned. They drove around to the back of Walter Sr.'s house, screeched the truck's tires, and started to holler. Walter Sr., Walter Jr., and Antonio Sr. were outside the house and told them to quiet down. Wilfredo, Antonio Jr., and William then proceeded to boast about how they had killed Orlando at the warehouse, saying that they had "shot him up." They also described the amount of blood and mess the shooting had caused at the warehouse. Ms. Tappan heard that boasting from her room.

After an hour, Antonio Sr. came into the bedroom he shared with Ms. Tappan. He pulled a gun from his boot, saying "if you heard anything or seen anything tonight, you better

5

keep your mouth shut; if not, I am going to kill you and your family." Realizing that in the circumstances discretion was better than candor, Ms. Tappan told Antonio Sr. that she had been asleep and had not heard anything.

The next morning, Wilfredo called the police from the OMC warehouse. When the police arrived, they found that the front glass door was locked from the inside and that an exterior metal door was open. They found pry marks in the door jam that appeared to have been made to create the look of a forced entry. The police found Orlando's body in the rear of the building, lying face down on the floor. A trail of blood led from a set of interior doors to the body. There were no signs of a struggle. Orlando's body had five gunshot wounds in it.

After Orlando's murder, the Hernandez clan had several discussions about blowing up and burning the OMC business; Ms. Tappan overheard their planning. Walter Sr. asked William if he had brought the supplies from Maryland -- the pipes -- and William confirmed that he had the "supplies" in the back of the stolen pickup. The motive for the fire bombing, which came out during these discussions, was that there were too many things that they had to get rid of, and Walter Sr. badly needed the insurance money to pay his bills. The Hernandezes agreed that Wilfredo, William, Antonio Jr., Walter Jr., and Antonio Sr. would destroy the warehouse. Before the group set their plan in motion, Ms. Tappan left Miami and was not privy to any further conversations. Antonio Sr., however, insisted that he keep Ms. Tappan's car in Miami and said that he would return it when he was finished with "the job that he had to do at the warehouse."

On December 3, 1989, three pipe bombs exploded at the OMC warehouse, igniting gasoline that had been poured in it. The explosion and resulting fires caused extensive damage to the warehouse. The bombs had been placed in separate rooms on the second story and appeared to have been made of ordinary metal pipes. Burned and unburned pieces of fuse littered the areas surrounding the bombs and there was evidence that the fuses had been run from the first to the second floor.

When Antonio Sr. returned to Tappan's home in Maryland, he acted pleased. He said, according to Ms. Tappan, that "he should be getting a pretty good amount of money for the job that he had done and that they were all . . . going to share, the whole family . . . was going to share in some of that money for the job that they had done."

Five days after the OMC warehouse had been destroyed, Walter Sr. called Orion Insurance to file a claim. He said that he had some trouble contacting his broker, and he was "a little bit . . . excited." The next Monday or Tuesday, Antonio Cecilio, an Orion claims manager, went to OMC with David Eliassen, a certified fire investigator, and two other Orion claims adjustors. Walter Sr. was not present, but two young men who identified themselves only as the "nephew" and the "son" of Walter Sr. escorted the Orion representatives around the warehouse. The "nephew," later identified as Walter Jr., denied that any property had been moved or removed for safekeeping.

Days later, Mr. Eliassen questioned Walter Sr. about the fire. Walter Sr. said that he owned  OMC by himself, and that he had twelve employees, although he was unable to provide names and addresses for anyone besides his sons, Wilfredo and Walter Jr.  Walter

7

Sr. also said that the OMC alarm system was not working at the time of the fire because the police damaged it while they were investigating Orlando's murder. He denied having filed any prior insurance claims.

Orion commissioned an appraisal company to conduct an inventory of OMC. During the inventory, Walter Sr. identified items and stated values for them, "giving a figure out of his head." The appraisers finished making a list of only about three-fourths of the warehouse's inventory. Apparently, Walter Sr. kicked them out in a fit of rage before they could complete their task. The appraisers submitted their incomplete list to Orion, valuing the contents of the warehouse at $886,836.47. The appraisers did not, however, verify Walter Sr.'s valuations of the inventory.

Eventually, relations between the Hernandezes and Orion turned sour. Eliassen discovered that Walter Sr., despite his denial, had filed an insurance claim before. In 1980, there had been a fire at his previous optical business. The fire had been deliberately set with gasoline and an incendiary device. Like the fire at OMC, it had been preceded by a shooting incident, the alarm did not go off during the fire, and the fire department found the building securely locked when they arrived. There was another "coincidence" between the two fires: Walter Sr. had purchased insurance for both businesses within months of the fires. Eliassen reported his findings to Orion.

Eliasson's report quite naturally made Orion skeptical of Walter Sr.'s claim. In January 1990, Walter Sr. submitted a sworn proof of loss to Orion, claiming $371,709.86 as a "partial claim." To verify that claim, Orion repeatedly asked Walter Sr. and his attorney

8

to provide various documents and other information to support the claim. Those requests were not answered, at least not in the manner Orion hoped. Instead of receiving documentation, Orion received threats; unnamed persons threatened to blow up the building in which Orion was located.

In March of 1990, Walter Sr. met with Juan Alvarez, another Orion employee, to discuss his claim. Walter Jr. and another young man stayed in the reception area. At one point, Walter Jr. approached an Orion employee and stared at him, as if to challenge him. Later that day, Orion's owners decided to rid themselves of the OMC claim and hopefully of the Hernandezes. They offered to settle the claim for $50,000, which Walter Sr. readily accepted.

## II. DISTRICT COURT PROCEEDINGS

On November 8, 1995, a federal grand jury in the Southern District of Florida returned an indictment against Walter Sr., Walter Jr., Antonio Sr., Antonio Jr., Wilfredo and William. The indictment charged all defendants with: (1) a multi-object conspiracy to commit murder-for-hire, arson and mail fraud, in violation of 18 U.S.C. § 371; (2) use of interstate commerce facilities in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958; (3) arson, in violation of 18 U.S.C. § 844(I); (4) eight counts of mail fraud, in violation of 18 U.S.C. § 1341; and (5) using fire to commit a federal felony offense, i.e., mail fraud, in violation of 18 U.S.C. § 844(h). Walter Sr. was also charged with three counts of bank fraud, in violation of 18 U.S.C. § 1344.

9

The district court severed William's case from the trial. He later pled guilty to the multi-object conspiracy count. The other defendants went to trial before a jury. During the five-week trial, the government's key witness was Lerida Baldo Tappan. She testified about the conversations that she had overheard. Her testimony was crucial to the government's proof of the conspiracy and proof of which conspirators engaged in which unlawful acts. Also, several employees of Orion testified to the behavior of the Hernandezes in connection with the insurance claim. Forensic evidence revealed the means by which the murder of Orlando and the arson were committed. Finally, over the objection of the defendants, the government introduced evidence of the fire at Walter Sr.'s previous optical business, his previous conviction for solicitation of the murder of his wife, and evidence that Antonio Sr. and Antonio Jr. had committed another arson in Maryland.

At the conclusion of the government's case-in-chief, the defendants moved for a judgment of acquittal. The district court granted acquittals to Wilfredo and Walter Jr. on the murder-for-hire charge on the ground that they neither moved, nor caused anyone else to move, in interstate commerce to commit the murder-for-hire. The court also reserved ruling on the mail fraud counts as to all defendants except Walter Sr. It denied Walter Sr.'s motion for acquittal on those counts.

During the presentation of the defense case, Walter Sr. testified on his own behalf and underwent cross-examination. Counsel for Walter Jr., however, deferred cross-examining Walter Sr., stating, "No questions at this time, your Honor." Later, Walter Jr. announced that he intended to call his father for examination limited to those areas addressed by Walter Sr.

10

in his own direct examination. Walter Sr., however, refused to take the stand, asserting his Fifth Amendment privilege against self-incrimination, even though he had already testified for three days. The court allowed Walter Jr. to make a proffer, but ultimately ruled that Walter Jr.'s Sixth Amendment rights yielded to his father's assertion of his Fifth Amendment privilege against self-incrimination.

The jury returned guilty verdicts as to all defendants on the remaining counts. The defendants renewed their motion for judgment of acquittal and alternatively moved for a new trial. The district court granted acquittals on the mail fraud counts with respect to Antonio Sr., Antonio Jr., Walter Jr., and Wilfredo, but denied all the other motions. Therefore, the final results in the district court were that: Walter Sr. was convicted of the multi-object conspiracy, murder-for-hire, arson, mail fraud, and bank fraud; Antonio Sr. and Antonio Jr. were convicted of the multi-object conspiracy, murder-for-hire, and arson; and Walter Jr. and Wilfredo were convicted of the multi-object conspiracy and arson.

Pursuant to their convictions for murder-for-hire, Walter Sr., Antonio Sr., and Antonio Jr. were sentenced to life imprisonment. Wilfredo was given the maximum sentence he could receive under the law: 120 months imprisonment for his arson conviction, with his five-year conspiracy sentence to run concurrently.[1] Walter Jr.'s sentencing, however, was somewhat more contentious.

---

[1]We conclude that the district court did not commit error in sentencing Walter Sr., Antonio Sr., Antonio Jr., and Wilfredo, but we see no purpose to be served in discussing the district court's intricate sentence calculations for each defendant.

11

Because Walter Jr. was convicted of a multi-object conspiracy, U.S.S.G. § 1B1.2(d) applied. That provision required the district court, as a trier of fact, to determine whether Walter Jr. conspired to commit each object of the conspiracy. See U.S.S.G. § 1B1.2(d). Although it had granted him an acquittal on the substantive murder-for-hire count, the district court found that Walter Jr. had conspired to commit murder-for-hire. Accordingly, the court set his base offense level at 43, the offense level applicable to the underlying unlawful conduct, which is murder-for-hire. From level 43, the court adjusted Walter Jr.'s offense level downward two levels pursuant to U.S.S.G. § 3B1.2, because he had played only a minor role in the conspiracy. Next, the court departed downward twelve levels pursuant to U.S.S.G. § 5K2.0 because of the negative parental influence to which Walter Jr. was exposed. The resulting offense level was 29 which, in conjunction with Walter Jr.'s criminal history category of IV, produced a sentencing range of 121-151 months. Because the maximum sentence for the greater of the his two offenses (arson) was below the minimum guidelines range, Walter Jr. was sentenced to the statutory maximum for that offense – 120 months. The district court also sentenced him to sixty months on the multi-object conspiracy conviction, the term of which was to run concurrently with his 120 month sentence.

All the defendants appealed their convictions and sentences to this Court. The government has not cross-appealed any of the sentences given to the defendants.

### III. STANDARDS OF REVIEW

We review a district court's ruling on a defendant's invocation of his privilege against self-incrimination de novo. See United States v. Hidalgo, 7 F.3d 1566, 1568 (11th Cir.

1993). Whether there was sufficient evidence to support a conviction is a question of law subject to a de novo review. See United States v. Keller, 916 F.2d 628, 632 (11th Cir. 1990). We review the district court's application of the sentencing guidelines de novo. See United States v. Barakat, 130 F.3d 1448, 1452 (11th Cir. 1997); United States v. Lewis, 115 F.3d 1531, 1536 (11th Cir. 1997). This Court will accept the district court's findings of fact related to sentencing unless they are clearly erroneous. See Barakat, 130 F.3d at 1452.

## IV. DISCUSSION

A.     WHETHER WALTER JR.'S SIXTH AMENDMENT RIGHTS WERE VIOLATED BY THE DISTRICT COURT'S FAILURE TO REQUIRE WALTER SR. TO TESTIFY DURING WALTER JR.'S CASE-IN-CHIEF.

After Walter Sr. testified on his own behalf during his case-in-chief, he was questioned by the attorneys for his codefendants, except for Walter Jr.'s counsel. Later, during his own case-in-chief, Walter Jr. tried to recall Walter Sr. to the stand to testify within the scope of his direct examination, but Walter Sr. refused, asserting the Fifth Amendment privilege against self-incrimination. The district court refused to force Walter Sr. to testify any more, concluding that his Fifth Amendment privilege trumped Walter Jr.'s Sixth Amendment Confrontation and Compulsory Process rights. On appeal, Walter Jr. contends that his Sixth Amendment Confrontation Clause and Compulsory Process Clause rights were violated by the district court's refusal to force Walter Sr. to testify. Because Walter Jr. wanted to elicit testimony in his favor from Walter Sr., instead of wanting to undermine his credibility as a witness, the claim sounds under the Compulsory Process Clause instead of

13

under the Confrontation Clause. We reject that claim without deciding the merits of it, because after considering all the facts and circumstances, we are left with no doubt that any error the district court may have committed by refusing to order Walter Sr. to return to the stand was harmless beyond a reasonable doubt.

This Court has held that, on direct review, Sixth Amendment violations are subject to the harmless error analysis announced in Chapman v. California, 386 U.S. 18, 87 S. Ct. 824 (1967). See Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438 (1986); United States v. Baptista-Rodriguez, 17 F.3d 1354, 1367 (11th Cir. 1994); United States v. Lankford, 955 F.2d 1545, 1552 (11th Cir. 1992); United States v. Watson, 669 F.2d 1374, 1383 (11th Cir. 1982). Even where one defendant in a multi-defendant case has been denied the opportunity for any cross-examination, the Chapman harmless error standard is still applicable. See United States v. Mills, 138 F.3d 928, 936-40 (11th Cir. 1998). In Chapman, the Supreme Court held that for a constitutional violation to be harmless, "the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Chapman, 386 U.S. at 24, 87 S. Ct. at 828. Our task, therefore, is to decide whether we have a reasonable doubt that the result in Walter Jr.'s case would have been the same had he been able to call Walter Sr. to the stand as a witness on his behalf. To decide that, we look to the avenues Walter Jr. would have pursued in questioning Walter Sr. and the probable impact those questions would have had on the ultimate outcome in Walter Jr.'s case.

In his brief, Walter Jr. proffers six areas that he intended to explore in his examination of Walter Sr: (1) whether Walter Jr. was an Optical Manufacturing Employee; (2) whether

14

Walter Sr. ever asked Walter Jr. to intervene with the insurance adjustors; (3) whether Walter Sr. ever saw Walter Jr. speak with anyone from the insurance company; (4) whether Walter Jr. had a good relationship with Orlando; (5) whether Walter Jr. was present when Ms. Tappan was at Walter Sr.'s house; and (6) whether Walter Jr. evaded the questions of Orion insurance adjustors by moving to Maryland. Walter Jr. argues that all of these questions were relevant to his defense, particularly those regarding Walter Jr.'s presence during Ms. Tappan's stay in Miami and his relationship with Orlando.

### a. The First And Fifth Lines Of Questioning Were Merely Cumulative Of Other Testimony Before the Jury

As to the first line of questioning, whether Walter Jr. worked at OMC, Walter Jr. called as a witness Thomas Hernandez, who testified that Walter Jr. came to OMC every day after school. Also, Maria Hernandez testified that Walter Jr. helped out at OMC occasionally. It is unclear what Walter Sr. could have added by his testimony, and Walter Jr. does not explain why he felt that establishing that he worked at OMC was important to his defense. Regardless, we agree with the government that, based on the testimony of Thomas and Maria Hernandez -- which was not contradicted by any other evidence -- Walter Sr.'s testimony that Walter Jr. worked at OMC would have been merely cumulative.

Similarly, Walter Jr.'s fifth area of questioning, aimed at establishing he was not present while Ms. Tappan was at Walter Sr.'s house, was on a settled point. Maria Hernandez testified that none of Walter Sr.'s sons were in the house while Ms. Tappan was

15

there. Walter Sr. had already testified to the same thing. A defendant is not entitled to have a witness give the same answer twice at different times during the trial.

> b. *The Second, Third And Sixth Lines Of Questioning Were Directed At the Mail Fraud Counts On Which Walter Jr. Was Acquitted*

As to the second line of questioning, whether Walter Sr. ever asked Walter Jr. to intervene with the insurance adjustors, nothing Walter Sr. could have said would have been relevant to the charges upon which Walter Jr. was convicted. That line of questioning would have been relevant to the mail fraud charges, but the district court granted a judgment of acquittal to Walter Jr. on those counts, explaining that it did not think Walter Jr. was part of the mail fraud conspiracy. Cf. United States v. Pielago, 135 F.3d 703, 708 (11th Cir. 1998)(holding that the use of the defendant's proffer statement to indict her on one count of an indictment was harmless because that count was later dismissed).

The district court's acquittal of Walter Jr. on the mail fraud conspiracy counts also rendered Walter Jr.'s third line of questioning irrelevant. Walter Jr. wanted to ask Walter Sr. whether he ever saw Walter Jr. speak to anyone from the insurance company, which was relevant only to the mail fraud conspiracy counts. Therefore, Walter Jr. suffered no prejudice by not being allowed to pursue that line of questioning.

As to the sixth line of proposed questioning, Walter Jr. argues that he would have asked Walter Sr. whether Walter Jr. was trying to evade Orion's investigators by moving to Maryland. Because that line of questioning would have been relevant only to the mail fraud

16

counts, Walter Jr.'s acquittal on those counts removed any prejudice that might have occurred from his inability to question Walter Sr. on the subject.

> c. *Because The District Court Acquitted Walter Jr. Of the Murder-For-Hire Count And Because There Was Evidence Sufficient To Convict Him Of Another Object Of the Multi-Object Conspiracy, His Inability To Pursue The Fourth Line Of Questioning Was Harmless.*

As to the fourth line of questioning, Walter Jr. says that as part of his attempt to show noninvolvement in Orlando's murder, he would have asked Walter Sr. whether he believed Walter Jr. had an especially close relationship with Orlando. However, Walter Sr. had already testified that all of his sons had a good relationship with Orlando. Furthermore, one of Walter Jr.'s uncles, Alcibar Hernandez, testified that Orlando had loved Walter Jr. "like a son," and that the two were very close. Thus, Walter Jr.'s attempt to further refine his father's testimony on this subject, moving his description of the relationship from "good" to "especially close" would have been cumulative to a substantial degree. No one testified that the relationship between Orlando and Walter Jr. was not close.

Moreover, the district court acquitted Walter Jr. of the substantive murder-for-hire count. Therefore, he was not prejudiced by the jury's inability to consider, in regard to that count, Walter Sr.'s perception of a special relationship between Orlando and Walter Jr. He was convicted only of the multi-object conspiracy and arson. Arson was one of the objects of the multi-object conspiracy. Walter Jr. does not contend that the evidence was insufficient to convict him of the arson count or of conspiracy to commit arson. Whether he was close to Orlando would have been largely irrelevant to the arson count and whether he was guilty

17

of conspiracy to commit arson. Given that there was sufficient evidence to convict him of conspiracy to commit arson, Walter Jr.'s conviction for the multi-object conspiracy cannot be overturned on the grounds that he should have been allowed to introduce evidence he was not guilty of murder-for-hire or conspiracy to commit murder-for-hire. See Griffin v. United States, 502 U.S. 46, 57-58, 112 S. Ct. 466, 473-74 (1991); United States v. Ross, 131 F.3d 970, 983 (11th Cir. 1997)("A guilty verdict in a multi-object conspiracy will be upheld if the evidence is sufficient to support a conviction of any of the alleged objects.").[2] Any error in refusing to require Walter Sr. to testify as to Walter Jr.'s relationship with Orlando was harmless beyond a reasonable doubt.

In summary, if there was error in failing to permit Walter Jr. to recall Walter Sr. as witness, the error was harmless beyond a reasonable doubt. We have no reason to doubt that had Walter Jr.'s hopes concerning further examination of Walter Sr. been realized, Walter Jr. would still have been convicted of the same two charges.

B. WHETHER THERE WAS EVIDENCE SUFFICIENT FOR THE DISTRICT COURT TO FIND THAT, FOR THE PURPOSES OF U.S.S.G. § 1B1.2(d), WALTER JR. CONSPIRED TO COMMIT MURDER-FOR-HIRE

As we have mentioned, Walter Jr. was convicted of a conspiracy the objects of which were alleged to be the commission of murder-for-hire, arson, and mail fraud. Generally, in sentencing a defendant on a conspiracy count, a court sets the defendant's base offense level

---

[2]We reject Walter Jr.'s contention that the district court should have used a special verdict form for the multi-object conspiracy count. See United States v. Shenberg, 89 F.3d 1461, 1472 (11th Cir. 1996), cert. denied 117 S. Ct. 961 (1997).

18

by using the offense level of the underlying substantive offense that was the object of the conspiracy. See U.S.S.G. § 2X1.1(a). However, the general rule of § 2X1.1(a) requires refinement in the case of a multi-object conspiracy, because there is more than one underlying substantive offense upon which a court could base the offense level. The refinement the Sentencing Guidelines make in multi-object conspiracy cases is to treat the defendant as if he "had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." U.S.S.G. § 1B1.2(d). To determine which offenses the defendant conspired to commit, the sentencing court must consider the evidence to decide whether, if it were sitting as a trier of fact, it would have found beyond a reasonable doubt that the defendant was guilty of conspiracy to commit the object offense. See U.S.S.G. § 1B1.2 n.5.

Application Note 5 to § 1B1.2 sets forth the procedure district courts should follow when a jury renders a general verdict of guilty on a multi-object conspiracy:

> Particular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit the object offense.

In United States v. McKinley, 995 F.2d 1020, 1026 (11th Cir. 1993), we interpreted the words "were it sitting as a trier of fact" in Application Note 5 to mean "that the court must find beyond a reasonable doubt that the defendant conspired to commit the particular object

19

offense" before the offense level for that object offense can be used to calculate the defendant's sentence.

At the guilt stage, the district court granted Walter Jr. a judgment of acquittal on the substantive murder-for-hire count. Nonetheless, at sentencing the court, sitting as a trier of fact pursuant to U.S.S.G. § 1B1.2(d) found that Walter Jr. had been proven beyond a reasonable doubt to have conspired to commit murder-for-hire. That finding, as a result of § 2X1.1, resulted in the base offense being 43, the level for the substantive offense of murder-for-hire. In contesting that determination, Walter Jr. argues that the evidence before the district court was insufficient to support a finding that he was guilty beyond a reasonable doubt of conspiring to commit murder-for-hire. Instead of being sentenced for that, he contends he should have been sentenced for conspiracy to commit arson, which would have meant a lower offense level.

Evidence is sufficient to support a conviction if, after reviewing the facts in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the defendant committed the essential elements of the crime. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); United States v. Ross, 131 F.3d 970, 974 (11th Cir. 1997). In reviewing the evidence, we draw all reasonable inferences from it "in favor of supporting the jury's verdict." United States v. Sawyer, 799 F.2d 1494, 1501 (11th Cir. 1986). It is emphatically not within the province of an appellate court to reweigh the evidence and the credibility of the witnesses at trial. See, e.g., Snowden v. Singletary, 135 F.3d 732, 739 (11th Cir. 1998)("Witness credibility is the sole province

20

of the jury."); United States v. Copeland, 20 F.3d 412, 413 (11th Cir.1994); United States v. Billue, 994 F.2d 1562, 1565 (11th Cir.1993); Castle v. Sangamo Weston, Inc., 837 F.2d 1550, 1559 (11th Cir.1988) ("Assessing the weight of evidence and credibility of witnesses is reserved for the trier of fact.").   Instead, we look at the evidence and decide only if it is sufficient to sustain the jury's verdict, or in this instance the trial court's beyond a reasonable doubt determination pursuant to § 1B1.2(d) at sentencing.

We note at the outset that the district court's grant of a judgment of acquittal to Walter Jr. on the substantive murder-for-hire count is not inconsistent with its finding that Walter Jr. was guilty of conspiring to commit murder-for-hire.   Conspiracy and the substantive offense that is the object of the conspiracy are separate and distinct crimes. See, e.g., United States v. Romeros, 600 F.2d 1104, 1105 (5th Cir. 1979) (citing Iannelli v. United States, 420 U.S. 770, 777-778, 95 S. Ct. 1284 (1975); United States v. Ragano, 520 F.2d 1191, 1198 (5th Cir. 1975)).   It is well established that acquittal on the substantive count does not foreclose conviction on the related conspiracy count. See id.   In this case, the district court concluded that the government failed to show that Walter Jr. moved in interstate commerce to commit the murder-for-hire, an element of the crime. See 18 U.S.C. § 1958 (stating that  a person is guilty of the federal crime of murder-for-hire if they knowingly and willfully (a) traveled or used the mail or another facility in interstate commerce, or caused another to do the same; (b) with the intent that a murder be committed; (c) as consideration for a promise to pay anything of pecuniary value).   Even if Walter Jr. did not commit all the elements of the murder-for-hire statute, as the district court determined, he still could have conspired with

21

others to bring about the commission of the murder-for-hire. See United States v. Tombrello, 666 F.2d 485, 489 (11th Cir. 1982); Romeros, 600 F.2d at 1105. We therefore reject as meritless Walter Jr.'s assertion that the district court's determination he was guilty of conspiracy to commit murder-for-hire was inconsistent with its conclusion he was not guilty of the substantive murder-for-hire crime.

We now turn to the separate question of whether the government produced evidence sufficient for the district court to find beyond a reasonable doubt that Walter Jr. was guilty of the offense of conspiracy to commit murder-for-hire. For conspiracy to commit murder-for-hire, the government was required to prove beyond a reasonable doubt: (1) an agreement by two or more persons to achieve the unlawful purpose of murder-for-hire; (2) the defendant's knowing and voluntary participation in the agreement; and (3) an overt act committed by any one of the conspirators in furtherance of the conspiratorial object. See United States v. Brenson, 104 F.3d 1267, 1281-82 (11th Cir. 1997), cert. denied 118 S.Ct. 214 (1997). Walter Jr. concedes that the government produced sufficient evidence of an agreement and an overt act, the first and third elements. However, he contends that there was no evidence that he knowingly and voluntarily participated in the agreement, which is the second element. "To prove knowing and voluntary participation, the government must prove beyond a reasonable doubt that . . . [the accused] had a specific intent to join the conspiracy. United States v. Calderon, 127 F.3d 1314, 1326 (11th Cir. 1997), cert. denied 118 S.Ct. 1328 (1998). "At a minimum, the defendant must willfully associate himself in some way with the

22

criminal venture and willfully participate in it as he would in something he wished to bring about." United States v. Newton, 44 F.3d 913, 922 (11th Cir. 1994).

Important to our analysis of the sufficiency of the evidence is the relevant time frame of the murder-for-hire conspiracy. As we have stated, "[a] conspiracy's duration is difficult to prove precisely, but generally continues until its purposes have either been abandoned or accomplished." United States v. Knowles, 66 F.3d 1146, 1155 (11th Cir. 1995). In other words, "the conspiracy may be deemed to continue as long as its purposes have neither been abandoned nor accomplished." United States v. Starrett, 55 F.3d 1525, 1550 (11th Cir. 1995)(quoting United States v. Gonzalez, 921 F.2d 1530, 1548 (11th Cir. 1991)). Accordingly, the murder-for-hire conspiracy in this case was complete when Orlando was murdered, and the question is whether the government proved that before the murder was committed Walter Jr. joined in the agreement to do it.

This Court has repeatedly held that the mere presence of a defendant with the alleged conspirators is insufficient to support a conviction for conspiracy. See, e.g., United States v. Lopez-Ramirez, 68 F.3d 438, 441 (11th Cir.1995). However, we have stated that a "conspiracy conviction will be upheld . . . when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him." Calderon, 127 F.3d at 1326 (internal quotations and citations omitted).

Walter Jr. argues that the government's evidence proved, at most, that he was merely present when the others conspired to commit the murder. He points out that the sole witness

23

who testified about the murder conspiracy discussions was Ms. Tappan, and she did not testify to a single word being said by or to Walter Jr. during those discussions. Therefore, he argues, the only evidence the government produced that he conspired to kill Orlando was his presence during the planning of the murder, and that is insufficient.

Our review of the evidence convinces us that Walter Jr. is correct. Ms. Tappan was the only witness who testified about Walter Jr. and the murder conspiracy discussions. The following is her testimony about those discussions:

Q. When you were at the house were there any discussions regarding the man at the warehouse, Orlando?

A. Yes, I heard some discussions that they were having about this man, Orlando.

Q. Okay, who was present for this discussion that you heard?

A. It was Willie, Waltico, Pili, Walter Senior, Tony Junior, Tony Senior.[3]

Q. What did they discuss?

A. They were discussing that they had to get rid of him

MR. KRITZER: Objection as to who said what, identification of speaker, please.

THE COURT: Overruled.

BY MS. MANDEL:

Q. If you can recall, who did you remember hearing, participating in the conversation?

_____

[3]By these names, Ms. Tappan was referring to William, Walter Jr., Wilfredo, Walter Sr., Antonio Jr., and Antonio Sr., respectively.

24

A. Well, Walter Senior and Tony Senior were the ones doing the discussion and then the other, Tony Junior and Pili and Willie were giving their, their remarks and ideas about what to do.

Q. What did Walter Senior say about getting rid of the guy at the warehouse?

A. He knew he had too much information, knew too much, he talked to too many people.

Q. And what did Tony Senior say about that?

A. That they had to get rid of him.

Q. What do you recall Tony Junior saying about that?

A. That they were going to shoot him up further than the moon.

Q. And what about Willie, what did he say about that?

A. He said that he was going to [sic].

Q. He was going to [sic], that he was going to go along?

A. That he was going to go along, yes.

Q. And did Pili or Waltico [Walter Jr.] say anything at that time?

A. Pili said that it was his turn to do this job to prove to his father that he could do it because he had just gotten here from Cuba and he had to prove that he was part of the family.

* * * *

Q. After you heard this discussion, did you hear anything else about the steps that were being taken to go to the warehouse?

A. Yes. They, Tony Junior, Willie and Pili were going to go in the truck, in the four-by-four, and --

Q. Did you hear them leave?

25

A. I heard them leave, yes.

**[1SR:23-26].**

Critical to Walter Jr.'s position is what Ms. Tappan did not say in her testimony. First, she did not attribute to Walter Jr. any of the comments during the discussion, none at all. Because she only overheard the discussion, Ms. Tappan could not even say that Walter Jr. remained in the room during the entire discussion; she could only say he was present when it began. See Fed. R. Evid. 602. Secondly, when asked pointedly by the prosecution whether Wilfredo (Pili) or Walter Jr. (Waltico) said anything regarding the decision to murder Orlando, she referred only to something that Wilfredo said, and she did not say that Walter Jr. said anything. She also testified that Wilfredo, William and Antonio Jr. drove to murder Orlando, while Walter Jr. stayed at home. Viewing Ms. Tappan's testimony in the light most favorable to the government, her testimony proved that Walter Jr. was present while Walter Sr. and Antonio Sr. decided that the murder of Orlando was necessary. He was also present while Walter Sr., Antonio Sr., Antonio Jr., William, and Wilfredo planned that murder. He said nothing during either discussion. He did not accompany Antonio Jr., William and Wilfredo to the warehouse to murder Orlando.

Ms. Tappan also testified that Walter Sr., Walter Jr., and Antonio Jr., were present when William, Antonio Jr., and Wilfredo returned from murdering Orlando. At that time, the murderers discussed their crime and the carnage they had wrought at the warehouse. However, Ms. Tappan once again failed to attribute to Walter Jr. any participation at all in

26

the discussion. He was merely present while the others talked about what they had done. Insofar as we know, he said nothing at all.

As we have stated, to prove knowing and voluntary participation, the government must prove beyond a reasonable doubt that the accused had a specific intent to join the conspiracy. See Calderon, 127 F.3d at 1326. In this case, Ms. Tappan's testimony offered an insight into the formation of the conspiracy to commit murder-for-hire itself, i.e., the discussion at Walter Sr.'s house. Even with that testimony, however, the government could not prove that Walter Jr. participated in the discussion. All it proved was that he was merely present during the discussion.

This Court was presented with a similar issue in United States v. Thomas, 8 F.3d 1552, 1556 (11th Cir. 1993). In Thomas, the government's case against one of the defendants was that he was present during the planning of a bank robbery. See id. at 1556-57. When his codefendants emerged from a bank after casing it, he stood with them while they discussed their plan to rob the bank. See id. The evidence indicated that the defendant, though present, did not participate in the discussion about robbing the bank. See id. at 1557-58 & n.8. We reversed his conspiracy conviction, concluding that:

> While the evidence presented by the government against [the defendant] would allow a reasonable jury to conclude that he knew of the planned bank robbery, it does not support the conclusion that he voluntarily participated in the agreement or the accomplishments of its goals. The evidence is simply not enough for a rational trier of fact to conclude beyond a reasonable doubt that [he] participated in the conspiracy to rob the [bank].

27

Id. at 1558. We find the Thomas case indistinguishable from this one. Ms. Tappan's testimony proved only that Walter Jr. was present while the others planned Orlando's murder. There was no evidence that he said anything, even in passing. Although a reasonable jury could conclude that he knew of the conspiracy to kill Orlando, knowledge alone is an insufficient basis for a conspiracy conviction. See Thomas, 8 F.3d at 1558; see also United States v. Brazel, 102 F.3d 1120, 1131 (11th Cir. 1997) (noting that mere guilty knowledge is an insufficient basis for a conspiracy conviction), cert. denied 118 S.Ct. 78 (1997); Lopez-Ramirez, 68 F.3d at 441; United States v. Lyons, 53 F.3d 1198, 1201 (11th Cir. 1995).

This case is not one that falls within that narrow group of cases in which we have upheld a conviction because the defendant was present where it would be unreasonable for anyone other than a knowing participant to be present. In United States v. Cruz-Valdez, 773 F.2d 1541, 1546 (11th Cir. 1985)(en banc), we held that a jury may find knowledgeable, voluntary participation from evidence of presence alone "when the presence is such that it would be unreasonable for anyone other than a knowledgeable participant to be present." The facts of that case were particularly telling: the defendant was captured aboard a seagoing vessel containing in excess of 1,000 pounds of marijuana. See id. at 1545. The defendant was a crew member on a small, marijuana-laden vessel that was in the course of a long voyage. See id. Moreover, the boat was a shrimping boat, and the Coast Guard found no evidence that the crew members had actually engaged in a shrimping operation. See id. at 1543-44. Under those circumstances, we found it to be reasonable for a jury to conclude

28

that: (1) the defendant/crew-member knew about the marijuana; and (2) it was highly improbable that drug smugglers would allow an outsider to accompany them on a boat filled with millions of dollars worth of marijuana. See id. at 1546. We felt that the jury could use its "common sense" and "general knowledge of the natural tendencies of human beings" to conclude that the defendant was, indeed, a knowing participant in the drug conspiracy. See id.; United States. v. Ospina, 823 F.2d 429, 433 (11th Cir. 1987) (holding the same on nearly identical facts); United States v. Gonzalez-Torres, 779 F.2d 626, 627 (11th Cir. 1986)(same).

The facts of the other cases in which we have employed the rule of Cruz-Valdez similarly led to the reasonable conclusion that the respective defendants were, indeed, knowing participants in conspiracies. In United States v. Lynch, 934 F.2d 1226, 1231 (11th Cir. 1991), one piece of evidence against the defendant was that he was present in his home while his co-conspirators carried out a drug transaction in it. Although there was other evidence against that defendant, we noted "[w]e think that a jury may conclude that it would be unreasonable for conspirators openly to conduct a drug deal in the home of . . . someone not part of their conspiracy." Id. In United States v. Arango, 853 F.2d 818, 825-26 (11th Cir. 1988), we held that the defendant's presence in a locked warehouse while 40 to 50 pounds of cocaine were being processed could lead the jury to conclude that the defendant was a knowing participant in a conspiracy to manufacture cocaine. We conclude that "[i]t is highly unlikely that cocaine processors would allow outsiders to have keys, and thus access, to their processing laboratories, containing thousands of dollars in equipment, raw materials, and finished product." Id. at 826.

29

The decisions that have applied the Cruz-Valdez rule are distinguishable from this case because of the special factual circumstances of Walter Jr.'s life, which were recognized by the district court. The court found that Walter Sr. had tyrannical control of his family members, especially Walter Jr., who was only 18 at the time of Orlando's murder. The court found Walter Sr.'s influence had been so overbearing and harmful to Walter Jr. that it departed downward twelve levels on that basis in sentencing Walter Jr. Given Walter Sr.'s patriarchal tyranny, it was not unlikely that he would permit his son to be present during the conspiratorial discussions even though his son was not a member of the conspiracy. That special circumstance was not present in any of the Cruz-Valdez-type cases.

We therefore conclude that neither Ms. Tappan's testimony nor any other evidence provided sufficient basis for the district court's finding that Walter Jr. was guilty of conspiracy to commit murder-for-hire beyond a reasonable doubt. Accordingly, we vacate his sentence. On remand, the district court should set Walter Jr.'s base offense level for his multi-object conspiracy commensurate with the base offense level for arson. See U.S.S.G. § 2X1.1. The district court should then make new sentencing determinations based upon that base offense level.[4]

     C.     WHETHER THERE WAS SUFFICIENT EVIDENCE FOR THE JURY TO CONCLUDE THAT ANTONIO SR. AND ANTONIO JR. PARTICIPATED IN ORLANDO'S MURDER IN RETURN FOR SOMETHING OF PECUNIARY VALUE.

---

[4]Our discussion does not disturb in any way the factual basis of the downward departure. However, in view of the lower base offense level, the district court is free to revisit the extent of that departure, or to leave it at twelve levels.

Antonio Jr., Antonio Sr., and Walter Sr. contest their convictions for murder-for-hire on the grounds that there was insufficient evidence to find them guilty beyond a reasonable doubt. To be convicted of murder-for-hire in violation of 18 U.S.C. § 1958, the government must prove beyond a reasonable doubt that the defendants: (a) traveled or used the mail or another facility of interstate commerce; (b) with the intent that a murder be committed; and (c) that it be committed as "consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value." 18 U.S.C. § 1958. Not only the actual murderer, but also the one who solicits the murder is criminally liable under the statute. See 18 U.S.C. § 1958 (criminal liability includes "whoever . . . causes another" to travel in interstate commerce to commit a murder-for-hire).

The defendants' contention about the sufficiency of the evidence is limited to whether the government proved the consideration element. They argue that the evidence does not support the conclusion that, if they committed the murder at all, they committed it for pecuniary gain. The government argues the evidence as a whole was sufficient for the jury to infer that Antonio Sr. and Antonio Jr. drove down from Maryland to kill Orlando and blow up the OMC warehouse pursuant to an agreement with Walter Sr. that they would be paid part of the OMC insurance proceeds in return for committing those crimes.

### 1. The Proper Interpretation of 18 U.S.C. § 1958

The defendants argue that because § 1958, the murder-for-hire statute, uses the word "promise," we should incorporate traditional contract law into our analysis. The proper question, they say, is whether an enforceable, binding promise to pay something of pecuniary

31

value was made.  In support of their position, the defendants cite United States v. Wicklund, 114 F.3d 151 (10th Cir. 1997), a case in which it was undisputed that the murder was going to be done "on the house," and where the government conceded that "the evidence at trial would not support a finding of payment or agreement to pay for the intended murder." Id. at 152-53.  The Tenth Circuit rejected the proposition that all § 1958 requires is that the person soliciting the murder (not the one solicited to do it) stand to obtain a pecuniary benefit from the killing.  See id. at 153-54.  That is not the issue presented by the facts of this case. Whatever the Tenth Circuit may have said in Wicklund, its holding, as limited by the facts in that case, is not particularly relevant to the materially different facts in this case.

The defendants also rely upon United States v. Ritter, 989 F.2d 318 (9th Cir. 1993), which reversed the conviction of two defendants for conspiring to violate 18 U.S.C. § 1958. One of the defendants did not agree or intend to commit the offense;  he did not know that anyone was to be paid to commit the murder.  See id. at 321.  The other defendant's conspiracy conviction was reversed because his only co-conspirators were government agents, and because the agent pretending to be a hit man said he would not charge anything for the murder.  See id.  Those are not our facts.

The contract-based rules the defendants in our case argue for do not fit well in the § 1958 context.  An agreement to commit a crime is unenforceable, so it is ridiculous to speak of enforceable, binding contracts to commit crimes. By specifying the conditions under which agreements are enforceable, the law of contracts regularizes and encourages business transactions, which is the last thing Congress would have wanted to do with criminal

32

transactions. It is also noteworthy that § 1958 does not use the term "contract." Instead, the statutory element is that the murder be committed "as consideration for the receipt of, or as consideration for the promise or agreement to pay, anything of pecuniary value." 18 U.S.C. § 1958.

That language undeniably contemplates a quid-pro-quo (or at least the promise of such) between the parties to the transaction, the murderer and the solicitor. However, use of the word "consideration" does not import all of contract law. Instead, we interpret "as consideration for" in accordance with its plain, ordinary and natural usage, which is "in return for." See Random House Unabridged Dictionary 434 (2d ed. 1993). In this case, the issue is whether the government proved that Antonio Sr. and Antonio Jr. murdered Orlando in return for a "promise or agreement to pay, anything of pecuniary value." 18 U.S.C. § 1958. We turn now to resolution of that issue.

2.  Whether Antonio Sr. And Antonio Jr. Murdered Orlando In Return For Walter Sr.'s "Promise Or Agreement To Pay Anything Of Pecuniary Value"

Walter Sr., Antonio Sr., and Antonio Jr. concede that there is evidence the Hernandez clan fire bombed the OMC warehouse to reap the insurance proceeds. However, they contend there is no evidence demonstrating that Antonio Sr. and Antonio Jr. murdered Orlando in return for a promise or as part of an agreement that they would be paid for the murder. They claim the evidence indicates that their pay was to be for the arson, not the murder.

33

In support of their contention, the defendants cite to the testimony of Ms. Tappan, the only witness to describe the remunerative aspects of the plot. She testified, in relevant part:

Q: Did you take any trips with Tony Senior at that time [the fall of 1989]?

A: Yes, I did.

Q: Do you remember where you went?

A: Miami.

Q: What was the purpose for this trip?

A: [Antonio Sr.] had a business [sic], something, he had a job he had to do down here for his brother Walter Sr.

* * * *

Q: And what was the discussion that Tony Senior and Tony Junior and Willie had at your house?

A: That they had a job that they had to do for Walter in Miami.

Q: Did they discuss what the job was?

A: They said that they had to --

MR. KRITZER: Objection to "they said." I would like to know who said what.

THE COURT: Yes.

BY MS. MANDEL:

Q: Can you be specific about who said what during this conversation?

A: Tony Senior started the conversation, saying that they had to, there was a warehouse in Miami that they had to blow up, and the man that was keeping charge of it that had to be gotten rid of.

34

Later, Ms. Tappan continued her testimony related to the "job":

Q: You testified -- you had described that there were conversations before you left Maryland concerning a job that Tony Senior, Tony Junior, and Willie had to do in Miami, do you recall that?

A: Yes, I recall that.

Q: Did you hear any further conversations about that when you got here [Miami]?

A: They talked about getting rid of the warehouse, blowing it up past the moon.

\* \* \* \*

Q: Before you had traveled from Maryland did Tony Senior say anything about insurance money?

A: Yes, he did. They talked about the insurance money that they would get if they blew up the warehouse, that they would get a nice, a nice, a good amount of money in return for the job.

\* \* \* \*

Q: And did you have any discussions with [Antonio Sr.] about what had happened in Miami?

A: Yes.

Q: What did you discuss?

A: He said that he should be getting a pretty good amount of money for the job that he had done and that they were all, they were all going to share, the whole family, their family was going to share in the, in some of that money for the job that they had done.

The defendants argue that Ms. Tappan's testimony suggests that the arson was the "job" for

which they would be paid. They point to her statement that Antonio Sr. said that the family

35

would get money for blowing up the warehouse, while no mention was made of the murder. The defendants also point to the government's closing argument, in which it theorized that Orlando had been killed because he "knew too much" or to frame one of Walter Sr.'s rivals. They say that argument is a concession that Orlando was not killed for money, but for other reasons.

The defendants miss the point of Ms. Tappan's testimony. She testified that Walter Sr. had solicited Antonio Sr. and Antonio Jr.'s help to take care of a "job" and that Antonio Sr. and Antonio Jr. were driving to Miami to do a "job." When describing the job for which they would be paid, Ms. Tappan testified Antonion Sr. said "there was a warehouse in Miami that they had to blow up, and the man that was keeping charge of it had to be gotten rid of." Construing that testimony in the light most favorable to the government, as we are required to do, the jury reasonably could have inferred from it that the "job" included killing Orlando as well as blowing up the warehouse. It is true that Ms. Tappan's testimony indicated the money would come from the insurance proceeds paid after the warehouse was destroyed, but that relates to the source of the funds. It does not make unreasonable the inference that the agreement was that the funds were to be paid for both aspects of the job.

In the same vein, Walter Sr.'s underlying motive for wanting Orlando killed is not determinative. The solicitor of a murder-for-hire, by definition, will usually have a different motive for the killing than those who carry it out. The solicitor pays to have someone killed, while the murderer kills to have someone pay him. It may be and probably is true that Walter Sr. wanted Orlando dead because he "knew too much." That does not help his case, because

36

in the murder-for-hire context of § 1958 it is the motive of the murderers that is relevant to whether the murder occurred in return for a promise to pay something of pecuniary value. Because there was sufficient evidence for the jury to infer that Antonio Sr. and Antonio Jr. killed Orlando for money which Walter Sr. agreed to pay them from the OMC insurance proceeds, the murder-for-hire convictions of Antonio Sr., Antonio Jr., and Walter Sr. are due to be affirmed.

## V. CONCLUSION

We AFFIRM all the convictions of all the defendants. We VACATE Walter Jr.'s sentence and REMAND to the district court for resentencing consistent with this opinion.