**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 28 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ERIC W. WICKLUND,

Defendant-Appellant.

No. 96-4041

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 95-CR-35)

---

Herschel P. Bullen, Salt Lake City, Utah, for Defendant-Appellant.

Brooke C. Wells, Assistant United States Attorney (Scott M. Matheson, Jr., United States Attorney, with her on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.

---

Before SEYMOUR, Chief Judge, LOGAN and KELLY, Circuit Judges.

---

LOGAN, Circuit Judge.

Defendant Eric Wicklund appeals his conviction by a jury of using interstate facilities for the commission of murder-for-hire, in violation of 18 U.S.C. § 1958. The single issue on appeal is the proper construction of § 1958(a) and whether the phrase "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value" requires consideration in the contractual sense--which the evidence did not establish--or whether the expectation that an intended murder result in some economic benefit is sufficient. Because we hold that the government was required to prove an agreement or mutual understanding supported by consideration, we reverse the conviction.

I

Robert Laumann (Laumann) and his wife Paige were divorced; he obtained custody of the couple's five children and she was ordered to pay child support. Laumann, an Idaho state trooper, lived in Downey, Idaho, with the children. After the divorce Paige married defendant and lived with him in Ogden, Utah, in an apartment shared with several others including Robert Devore, a state probationer. A 1995 amendment to the divorce decree reduced to judgment against Paige (Laumann) Wicklund $4,300 for unpaid child support, more than $5,400 for unpaid marital debts and medical expenses, and increased her monthly child support obligation from $200 to $445.

Defendant became friendly with Devore and discussed with him a plan to kill Laumann and to start a murder-for-hire business. Defendant asked Devore to help him

obtain firearms to use to kill Laumann. Devore revealed defendant's plans to his probation officer, who arranged for Devore to use a body recorder and to help the FBI in an operation aimed at defendant. Ultimately defendant and Devore traveled to Idaho to purchase two guns which defendant agreed to buy from detective Steve Brown, who posed as a gun dealer. Defendant there transferred the guns to his brother's vehicle, after which the FBI agents arrested defendant.

The government characterized this evidence as a concrete plan to which criminal liability attached; the defense characterized it as defendant's imagination and storytelling run amok. Defendant, testifying on his own behalf stated that "my battleship mouth had overrun my kayak butt." III R. 282. It is uncontested that defendant stated he planned to do the Laumann murder "on the house." II R. 114, 146; III R. 192. The district court and the parties agree the record contains no evidence that defendant received anything of value before his arrest, nor did anyone promise or agree to pay him anything before or after the proposed murder. The extent of any financial benefit to defendant as a consequence of Laumann's death would be uncertain beyond Paige Wicklund's relief from child support obligations. Mrs. Wicklund testified at trial that she was unaware of the 1995 amendment to her divorce decree until government attorneys discussed it with her in January 1996, well after defendant's arrest. There was evidence that defendant thought his wife would receive proceeds of Laumann's life insurance policies if he died, because she would have custody of the children. Laumann, however, had told his former

wife that she was not a beneficiary and had named his new wife as primary beneficiary in the event of his death.

Asserting that the statute required consideration in a contractual sense, defendant sought a judgment of acquittal at the close of the government's case. The district court denied the motion and rejected defendant's proffered jury instructions defining the "in consideration for" requirement in contract terms. The court permitted the government to argue that "in consideration for" in the statute means "in expectation of" the receipt of anything of pecuniary value. It ordered the defense not to argue to the jury any contrary interpretation of the "in consideration for" requirement. The government concedes and the court found that the evidence at trial would not support a finding of payment or a promise or agreement to pay for the intended murder. See I(2) Supp. R. 9. Thus the issue on appeal is the proper construction of the statute, which we review de novo. United States v. Diaz, 989 F.2d 391, 392 (10th Cir. 1993).

II

The statute at issue was enacted as part of the Comprehensive Crime Control Act of 1984. The specific provision, as pertinent, reads as follows:

**§ 1958. Use of interstate commerce facilities in the commission of murder-for-hire**

(a) Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of,

or <u>as consideration for a promise or agreement to pay, anything of pecuniary value,</u> or who conspires to do so shall be fined under this title or imprisoned for not more than ten years, or both . . . .

18 U.S.C. § 1958(a) (emphasis added).

The district court concluded that

the criminal element of "consideration" in this statute is satisfied so long as the defendant intends to commit murder in order that a pecuniary benefit will flow from the killing. This interpretation gives effect to the plain, ordinary, and natural usage of "consideration" which commonly connotes one's expectation, motivation, or deliberation. As used in the statute, therefore, the phrase "as consideration for the receipt" connotes "in view of the receipt," "in expectation or contemplation of the receipt," "in order to obtain the receipt," and "in order to cause the receipt" of a pecuniary benefit.

I(2) Supp. R. 11. Under this interpretation the possibility of financial gain satisfies the "consideration/pecuniary gain" element of the statute. Many murders involve some expectation of pecuniary gain; under the district court's construction most murders during the course of interstate or foreign travel, or in which the mails are used or a telephone call is made across state lines, would violate the statute. The district court itself used the example of a person pursuing a victim across a state line to kill for his wallet. III T. 231.

We hold that the district court's interpretation is too broad. Its construction of the first clause in effect drops the words "as consideration" from the statute, reading it to forbid an intended murder "for pecuniary gain" or "in expectation of receiving pecuniary value." That interpretation of "as consideration for the receipt of . . . anything of pecuniary value" as meaning simply "in expectation of" pecuniary gain--not requiring a

quid pro quo--might be permissible if taken in isolation. But the district court acknowledged that the second phrase in that same sentence--"as consideration for a promise or agreement to pay, anything of pecuniary value"--does require a quid pro quo in the contract sense. We cannot reasonably construe the same phrase, one immediately following the other, to have different meanings.

If Congress had intended the statute to cover murder in expectation of pecuniary gain it could have drafted it to do so, as it did in other statutes. For example, 18 U.S.C. § 3592(c)(8), which states an aggravating factor that can be considered in determining when the death penalty is justified, reads as follows: "**Pecuniary gain.**--The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value." Also, 21 U.S.C. § 848(n)(7), dealing with aggravating factors for homicide, provides: "The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value." United States v. Walker, 910 F. Supp. 837, 848-49 (N.D.N.Y. 1995), interpreted § 848(n)(7) as having two separate prongs; the first "as consideration for" language contemplates only murder-for-hire, but the "in expectation of" language identifies a separate ground. In dicta Walker states that the section before us, 18 U.S.C. § 1958(a), "expressly transports the language of contract to both its prongs . . . . There is no dispute that § 1958 speaks only to murder-for-hire." 910 F. Supp. 848 at n.13. Accord United States v. Nguyen, 928 F. Supp. 1525, 1535-36 (D. Kan. 1996).

We hold that "in consideration for," as used in both prongs of § 1958(a) means consideration in the traditional sense of bargained for exchange. The two uses of "as consideration for" in the statute cover the two murder-for-hire situations: payment now or a promise or agreement to pay in the future. They describe separate situations and impose criminal liability regardless of whether the payment has occurred or is to occur later. This reading gives effect to every word of the statute, see Moskal v. United States, 498 U.S. 103, 109-10 (1990), and is internally consistent. This reading assigns the common law meaning to "in consideration for," which is appropriate in the absence of a statutory definition. United States v. Turley, 352 U.S. 407, 411 (1957) (when common law term appears in federal criminal statute and is otherwise not defined, it should be given that common law meaning).

We believe the statute is unambiguous. Resort to the legislative history is unnecessary to our decision, but supports our reading. See Negonsott v. Samuels, 507 U.S. 99, 106 (1993). Congress titled § 1958 "murder-for-hire." The Senate Report explains the enactment in a section entitled "Murder-For-Hire and Violent Crime in Aid of Racketeering Activity." S. Rep. No. 98-225, at 304 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3483. Congress intended § 1958 to impose criminal liability on "[b]oth the person who ordered the murder and the 'hit man.'" Id. at 306, 1984 U.S.C.C.A.N. at 3485. Congress addressed murders "carried out or planned as consideration for the receipt of 'anything of pecuniary value,'" id., or, stated another way,

"committed or planned as consideration for something of pecuniary value." Id. at 305, 1984 U.S.C.C.A.N. at 3484. This language is consistent with our reading of § 1958 as criminalizing payment made either before or after the murder, because both circumstances describe a mutual understanding that something of value will be exchanged for committing a murder. See also United States v. Edelman, 873 F.2d 791 (5th Cir. 1989) (the government prosecuted defendant under predecessor to § 1958, reciting the payment arrangements); United States v. Ransbottom, 914 F.2d 743, 746 (6th Cir.), cert. denied, 111 S. Ct. 439 (1990) (§ 1958 allows conviction if "a defendant traveled in interstate commerce with the intent that a contract murder be committed" before agreement reached with hit man who was actually working with the FBI).[1]

On the evidence presented a jury might find defendant guilty of some crime in either Utah or Idaho. The problem here is that he was indicted under a statute that does not apply to the activity for which he might be found guilty. Because the government concededly failed to prove defendant received or was promised anything of pecuniary value in exchange for his services, the conviction is REVERSED.

---

[1] We are mindful that the district court read § 1958(a) differently and believed as we do that the statute was unambiguous. Because judges who are presumed reasonable have read the same provision differently, some may argue it proves the statute is ambiguous as applied to the situation before us. If that is so the rule of lenity saves defendant. The rule of lenity, of course, "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." Chapman v. United States, 500 U.S. 453, 463 (1991) (quoting Callanan v. United States, 364 U.S. 587, 596 (1961)).