# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

PETER CHONG,
            *Defendant-Appellant.*

No. 03-10222

D.C. No.
CR-92-00260-DJL

OPINION

Appeal from the United States District Court
for the Northern District of California
D. Lowell Jensen, District Judge, Presiding

Argued and Submitted
March 15, 2005—San Francisco, California

Filed August 18, 2005

Before: Sidney R. Thomas and Raymond C. Fisher,
Circuit Judges, and James L. Robart, District Judge.*

Opinion by Judge Fisher

---

*The Honorable James L. Robart, United States District Judge for the
Western District of Washington, sitting by designation.

10917

## COUNSEL

William L. Osterhoudt and Frank S. Moore, Law Offices of William L. Osterhoudt, San Francisco, California; Alan P. Caplan, San Francisco, California, for the defendant-appellant.

Brian J. Stretch, Assistant United States Attorney, Oakland, California, for the plaintiff-appellee.

## OPINION

FISHER, Circuit Judge:

Peter Chong appeals his conviction on murder-for-hire and extortion counts stemming from his involvement with the Wo Hop To gang in Northern California. Chong's main contention is that the jury had insufficient evidence to convict him for his role in the attempted murder of a leader of a rival gang in Boston. He argues that the government failed to link him to the attempted murder or demonstrate that he offered anything of pecuniary value to the hitmen in exchange for commission of the murder — a required element of the offense.

We conclude that the jury had insufficient evidence to convict Chong on the murder-for-hire offense because the gov-

ernment failed to prove that Chong — or one of his co-conspirators — promised anything of pecuniary value to the hitmen as a quid pro quo for murdering a gang rival.

I.

Chong came to the United States in 1982 purportedly to set up and promote a Chinese opera in this country. In the late 1980s and 1990s, Chong became involved with illicit gang activity through his membership in — and eventual leadership of — the Wo Hop To, an organized crime gang in Northern California.

Chong and his gang engaged in loan sharking and exerted control over local gambling dens and restaurants, receiving discounts and collecting fees in exchange for leaving those establishments alone. Witnesses described Chong as "the person in charge of Wo Hop To" and testified that Chong had proclaimed that he was in control of Chinatown.

Chong wanted to expand the gang's control base to the East Coast and eventually dominate organized crime activity there. He was part of a plan to unite various rival gangs under an umbrella organization, which he would control. In furtherance of that end, Chong sent an underling to establish a foothold in Boston, which was controlled by gang rival Bike Ming. When the underling was killed before he could accomplish this task, Chong was very angry and met with gang leaders in the Bay Area "to take care of this matter." According to one gang leader, that meant "to get Bike Ming down, to get him killed." Chong also told an underling that if Ming was in the way "to take care of him." Subsequently, an attempt was made on Ming's life. Chong denied any involvement with the plot to kill Ming.

Chong was convicted by a jury for participating in a Racketeer Influenced and Corrupt Organization (RICO), 18 U.S.C. § 1962(c), and a RICO conspiracy, 18 U.S.C. § 1962(d). He

was also convicted of murder-for-hire counts, 18 U.S.C. §§ 371, 1958, heroin conspiracy, 21 U.S.C. § 846, and various extortion counts, 18 U.S.C. §§ 892, 894, 1951. Chong moved for acquittal at the end of his trial. The district court granted his motion as to the heroin conspiracy charge, but denied the motion as to the remaining counts.

On appeal, Chong challenges the evidence related to two sets of counts and the introduction and exclusion of certain testimony. We affirm the district court on the bulk of these claims in a separate memorandum disposition filed concurrently with this opinion. Our concern here is whether the jury had sufficient evidence that the hitmen were promised anything of value in exchange for the murder of Bike Ming, a critical element of the interstate murder-for-hire statute, 18 U.S.C. § 1958.

## II.

Evidence is sufficient to sustain a conviction if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Nelson*, 137 F.3d 1094, 1103 (9th Cir. 1998).

## III.

The federal murder-for-hire statute provides for conviction of a defendant who:

> travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay,

anything of pecuniary value, or who conspires to do
so . . . .

18 U.S.C. § 1958. Chong was also convicted under 18 U.S.C.
§ 371, which makes it a crime for two or more persons to con-
spire "to commit any offense against the United States . . . and
one or more of such persons do any act to effect the object of
the conspiracy." The elements of a conspiracy are: "1) an
agreement to accomplish an illegal objective, 2) coupled with
one or more acts in furtherance of the illegal purpose, and 3)
the requisite intent necessary to commit the underlying sub-
stantive offense." *United States v. Pemberton*, 853 F.2d 730,
733 (9th Cir. 1988) (adding that the agreement can be inferred
from circumstantial evidence).

Chong contends that no rational juror could have found —
based on the evidence presented — that he entered into an
agreement to cause the murder of Bike Ming or that he or any
member of the alleged conspiracy paid or agreed to pay any-
thing of pecuniary value for the attempted murder. We
address these elements of the offense in turn.

1. *Causing another to travel interstate with intent to
   commit murder*

The main evidence linking Chong to the murder of Bike
Ming came from his lieutenants Wayne Kwong and Raymond
Chow, both of whom had pled guilty to charges related to
their criminal gang activity. We summarize their relevant tes-
timony:

Kwong came to the United States in 1979 from mainland
China and settled in Boston. He met Peter Chong and Ray-
mond Chow when he went to San Francisco to escape from
the police after he was involved in a shooting in Boston. He
called Chong "uncle," as did other individuals who knew
Chong in the context of organized crime activity. When intro-
duced to Chong, Kwong was told "that uncle is the person in

charge of Wo Hop To" and that Raymond Chow was the "Big Brother of Hop Sing Tong," another gang in the Bay Area. Chong paid for Kwong's hotel bill, sheltered him in San Francisco and gave him money. Chong told Kwong that he and Wo Hop To controlled Chinatown and took a share of profit of the gambling dens in the city. Chow also told Kwong that Chong controlled Chow's Hop Sing Tong gang members.

Raymond Chow came to the United States at the age of 16 and joined the Hop Sing Tong gang in San Francisco. Chow became involved in selling heroin, extortion and racketeering and was arrested for armed robbery. He met Peter Chong after Chow's second release from prison in 1989. Chong told Chow that he was a member of Wo Hop To and had done work in the casino, heroin and cocaine business. The pair talked about forging a relationship between their two gangs, and the organizations eventually united.

The three leaders — Chong, Kwong and Chow — then discussed forming an umbrella organization called Tien Ha Wui, which translates into "Whole Earth Association," to oversee the individual gangs. Chong and Kwong also discussed expanding their dominance by taking over the markets in Boston. Chow said that Kwong had discussed the need to kill Bike Ming — a leader of the rival "Ping On" gang in Boston and a stumbling block in the plan to take over the streets of Chinatown in Boston. Kwong told Chong and Chow "that Bike Ming was in the way over there." According to Kwong, Chong "said that if he was in the way, kicked (sic) him out." Chong "meant . . . to take care of him. . . . He said that if he was in the way, take care of him." *Id.*

Chow said Chong had sent someone previously "to get the territory of Boston." "The job was to take over the Boston town and open up a gambling place." After one of Chong's underlings was shot in Boston while trying to establish a foothold, Chong discussed revenge. "[Chong] was very angry, and he said try to see . . . how to get someone to go up there

to take care of this matter." When asked what taking care of the matter meant, Chow testified, "that means to get Bike Ming down, to get him killed, whoever that were involved with this incident."

Kwong was present when another underling told Chong that a group of gang members almost "took care of Bike Ming" but failed. Chong said nothing in response, according to Kwong, but he "nodded, acknowledged him, and walked away." Kwong testified that he, Chow and Chong discussed how it would be easier to get underlings from another city to kill Bike Ming. After another failed effort by a group of underlings, Kwong reached out to a young Hop Sing Tong underling named Brandon Casey (who would emerge as the key figure in the murder-for-hire scenario). Kwong advised Casey of a job in Boston that needed to be completed. The plan called for Casey and a few cohorts to shoot Ming at a restaurant. However, when the group arrived at the restaurant in March 1992, they abandoned their plan because a police officer was present.

The recollections presented by these key witnesses about the attempt on Bike Ming's life was bolstered by evidence of the general custom and practice of the Wo Hop To and other gangs in San Francisco. Wo Hop To operated as a criminal enterprise with a structured hierarchy. Money collected from the gambling dens and loan sharking became part of the shared funds used to subsidize the organization's costs, including the payment of its underlings. Gang members also were commissioned to complete specific missions. For example, Casey testified about an earlier Wo Hop To-orchestrated arson, in which he was asked to assist and was told by a third party, "Peter [Chong]'s going to pay real good."

Additionally, the hierarchical structure of the gang meant that orders came from the top down, with Chong operating at the pinnacle of the group. Chong delegated to his lieutenants the management of the day-to-day operations, such as over-

seeing the collection of money from gambling dens and loan-sharking. Directions to complete missions trickled down through the ranks to the underlings who carried them out. Oakland Police Department Sergeant Harry Hu, an expert on the structure of Asian organized crime groups in the Bay Area, testified that the leader of a gang probably would not be engaged physically in the specific illegal activities of the group but instead would order underlings to commit the acts. Further, while the underlings would communicate with the seniors who gave them orders, "normally, they do not go all the way to the top . . . [b]ecause the leaders insulate themselves, and foot soldiers do not need to know all the details of operations," Hu explained. For example, Casey said he never actually met Chong and typically received his directions from other mid-level leaders.

[1] We conclude that the evidence adduced was sufficient to establish that Chong caused the murder-for-hire of Bike Ming. We rely on the *Pinkerton* doctrine, which holds a co-conspirator vicariously liable for reasonably foreseeable substantive crimes committed by a co-conspirator in furtherance of the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946). To establish *Pinkerton* liability, the prosecution must demonstrate that: "(1) the substantive offense was committed in furtherance of the conspiracy; (2) the offense fell within the scope of the unlawful project; and (3) the offense could reasonably have been foreseen as a necessary or natural consequence of the unlawful agreement." *United States v. Fonseca-Caro*, 114 F.3d 906, 908 (9th Cir. 1997) (citations and internal quotation marks omitted).

[2] Here, Chong's underlings were commissioned by his lieutenants to travel from San Francisco to Boston for the purpose of killing Ming, which was the objective of the conspiracy, and Chong could reasonably have foreseen that Chow would direct the underlings to commit the murder. Even if Chong did not give an explicit order to kill Ming, Chong

agreed with Kwong's assessment that getting rid of Ming was essential for expanding the gang's presence to the East Coast.

[3] The application of conspiracy liability is bolstered by the routine practices of the Wo Hop To, in which Chong regularly delegated tasks to his subordinates for them to manage. Thus, the record before us provides sufficient evidence from which a jury could have found that Chong or his co-conspirators set in motion a series of events, resulting in his underlings traveling to Boston for the purpose of killing Bike Ming.

### 2. *Promise or agreement to pay anything of pecuniary value*

[4] To convict under the murder-for-hire statute, however, the government must further prove that Chong gave or promised something of pecuniary value in exchange for seeking Ming's murder. *See* 18 U.S.C. § 1958 (providing that a person commits murder-for-hire by causing another to travel interstate to commit murder "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value"). "The intent to pay someone to commit murder is . . . a critical element of 'murder-for-hire.' " *United States v. Ritter*, 989 F.2d 318, 321 (9th Cir. 1993). According to the legislative history of § 1958, Congress intended the statute to punish "[b]oth the man who ordered the murder and the 'hit man.' " S. Rep. 98-225, at 306 (1983). As for the pecuniary component, "[t]he murder must be carried out or planned as consideration for the receipt of 'anything of pecuniary value.' This term is defined to mean money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage . . . ." *Id.*

[5] This circuit has not specifically interpreted the language of § 1958's pecuniary value requirement. We did, however, hold in *Ritter* that the government failed to prove that the

defendant, who had supplied a pipe bomb to carry out a murder, had "made an agreement or had the requisite intent to violate Section 1958." 989 F.2d at 321. Although the defendant was paid for the pipe bomb, he was not privy to the arrangements whereby the murderer himself would be compensated for planting the bomb; thus, "Ritter did not know that anyone would be paid to commit murder." *Id.*

**[6]** Other circuits have construed the pecuniary value requirement strictly, concluding that the element of the offense is not established in the absence of a clear agreement to exchange something of value for the commission of a murder. The Tenth Circuit, in *United States v. Wicklund*, interpreted the "in consideration for" language as requiring "consideration in the traditional sense of bargained for exchange" — a quid pro quo payment made either before or after the murder. 114 F.3d 151, 154 (10th Cir. 1997). The court rejected the government's claim that the pecuniary consideration element could be met where the defendant merely expected that his wife might benefit if he had her former husband killed.

In *United States v. Frampton*, the Second Circuit rejected the government's suggested inference that the defendant enlisted a professional hitman to commit murder in exchange for a "favor." 382 F.3d 213 (2d Cir. 2004). At trial, one of the conspirators was asked what consideration the hitman expected to receive for the murder. *Id.* at 218. He said: "If he needed a favor from me, he'd get a favor." Asked what this favor would be, the defendant responded: "Anything. Anything he need." *Id.* The court held that "consideration in the form of a 'favor' is insufficient to support a conviction" under the statute, "at least in the absence of evidence suggesting that either party had an understanding as to the form that it would actually take." *Id.* at 219.

**[7]** We agree with our sister circuits that there must be evidence that the hitmen clearly understood they would receive

something of pecuniary value in exchange for performing the solicited murderous act. That evidence is lacking here. The government argues that Brandon Casey and the other underlings assigned the task of murdering Bike Ming were each promised $100, satisfying the pecuniary value element of the statute. The government contends that the evidence demonstrated that the custom and practice of the Wo Hop To was to compensate members who carried out special assignments, even if the underlings did not receive significant payment for completing such missions. The government asks us to infer therefore that the $100 given to Casey was in exchange for the murder of Bike Ming.

**[8]** We decline to do so. The jury did not have sufficient evidence from which to find that the $100 constituted compensation for the murder-for-hire, given the absence of any overt agreement or understanding between Casey and Chong or Chong's co-conspirators. Even if the $100 could be sufficient consideration despite its de minimis amount, the evidence does not support the government's claim that this money was promised to Casey in return for murdering Bike Ming.

Casey's testimony was equivocal as to whether he actually received $100. He acknowledged that the job was something he knew that Raymond Chow wanted done. When then asked if he was paid $100 by Chow, Casey said "I think he did." Nonetheless, we assume the jury had enough to find that Casey got the $100.[1] But this is not enough to establish that Casey knowingly agreed to travel across the country to murder Ming in exchange for the money. Indeed, Casey did not know the purpose for which he was being sent to Boston before he left San Francisco. Rather, there was "a meeting and

---

[1]Casey also acknowledged that someone provided him with airline tickets to Boston and said he thought that someone else had bought their return tickets from Boston. The government does not argue the tickets were compensation or consideration.

volunteers were asked . . . to do a job. No more specifics than that." Casey knew the job was dangerous and violent; he was aware before they left that they were bringing guns to complete the task. However, it was not until *after* Casey and the other underlings had arrived in Boston and shortly before the murder attempt that Kwong told Casey "that we were there to kill someone . . . a guy named Bike Ming."

**[9]** None of this shows that Casey entered into an agreement or quid pro quo deal with the Wo Hop To lieutenants that he would kill Ming in return for some form of pecuniary consideration, as the statute requires. *See Frampton*, 382 F.3d at 217 ("The federal murder-for-hire statute proscribes a very limited category of behavior; only those instances in which one party agrees to commit a murder in exchange for another party's provision (or future promise) of payment are punishable under § 1958."); *United States v. Hernandez*, 141 F.3d 1042, 1057 (11th Cir. 1998) (holding that the language of the statute "undeniably contemplates a quid-pro-quo (or at least the promise of such) between the parties to the transaction, the murderer and the solicitor"); *Wicklund*, 114 F.3d at 154 (defining consideration as a "bargained for exchange").

**[10]** We place some weight on the government's failure to ask Casey directly (or even Chong's lieutenants) whether he was promised or received any consideration for attempting the murder of Bike Ming. As the Eleventh Circuit observed in *Hernandez,* "it is the motive of the murderers that is relevant to whether the murder occurred in return for a promise to pay something of pecuniary value." 141 F.3d at 1059. Thus, Casey's understanding of what compensation or consideration he would receive — and if the $100 was intended as payment — was critical to the murder-for-hire charge, but the government did not ask the relevant questions. Notably, the government did question Casey about other instances in which he earned money or other benefits for carrying out particular missions, such as committing robberies or sharing in the proceeds of collection jobs. In some instances, particularly spe-

cial missions, like the proposed Wo Hop To arson, Casey was told that completing the job would result in a specific financial reward.

[11] As to the Bike Ming assignment, however, the evidence shows only that Casey volunteered for a dangerous assignment and wound up getting some walking-around money in the course of traveling to Boston.[2] Money to cover incidental expenses rather than as compensation for carrying out the murder-for-hire does not meet § 1958's requirements. *See Ritter,* 989 F.2d at 321-22 (holding that although defendant was paid $70 to build a bomb, the money was not payment for commission of the murder). On the record here, we hold that the jury had insufficient evidence to find that Casey agreed to travel to Boston to kill Bike Ming in exchange for something of pecuniary value offered by Chong or his co-conspirators. Accordingly, we reverse Chong's conviction on the counts of murder-for-hire and conspiracy to commit murder-for-hire and remand to the district court for resentencing on the counts we have otherwise affirmed in a separate disposition.

REVERSED AND REMANDED for resentencing.

---

[2]Nor did the government solicit evidence that Casey was promised some other tangible benefit to be conferred on him through the gang structure in exchange for commission of the murder.