RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0312p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

STEPHANIE ACIERNO,

        *Defendant-Appellant.*

No. 07-4473

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 06-00558-002—Solomon Oliver, Jr., District Judge.

Argued: April 24, 2008

Decided and Filed: August 27, 2009

Before: COLE and CLAY, Circuit Judges; CLELAND, District Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:** Jonathan P. Witmer-Rich, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Gary D. Arbeznik, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Jonathan P. Witmer-Rich, Edward G. Bryan, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Gary D. Arbeznik, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

_____

**OPINION**

_____

CLELAND, District Judge. Defendant-Appellant Stephanie Acierno and her boyfriend, Alan Kessler, through many fits and starts, eventually hired a "hit man" –

---

[*]The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

actually an undercover FBI agent– to murder her estranged husband, Christopher Acierno ("Christopher"). They paid the agent a mere $100 which Defendant contends was only for "expenses," such as gas money, and argues that money for expenses cannot constitute payment of "anything of pecuniary value" as required to sustain the conviction she suffered: using a facility of interstate commerce with the intent that a murder be committed in consideration for payment of money under 18 U.S.C. § 1958(b)(1). Following the jury's guilty verdict, the district court denied Defendant's motion for judgment of acquittal under Federal Rule of Criminal Procedure 29. Defendant ("Stephanie") appeals, and we **AFFIRM** in all respects.

## I. BACKGROUND

### A.    Factual Background

On December 20, 2005, Alan Kessler called his old high school friend, Kyle Burns, using interstate telephone lines. Kessler wanted Burns to find somebody to kill Christopher Acierno, the estranged husband of Kessler's girlfriend, Stephanie. Kessler told Burns that if Christopher were killed, then Stephanie would receive the proceeds of a $70,000 life insurance policy, her husband's house, his car, and everything else that her husband owned. Kessler indicated that he was serious and suggested a few scenarios to carry out the murder, including a severe beating or disabling the brakes of Christopher's car.

Happily for Christopher, Burns reported Kessler's lethal intentions to the state police. They referred the matter to Cleveland Division FBI Special Agent Charles Sullivan who in turn contacted Burns. Later that night, Kessler called Burns again and told him not to kill Christopher but to engage him in a fight in an effort to induce Christopher to violate his probation. Thereafter, FBI Agent Steven Martz interviewed Burns and asked Burns to record any future conversations. During Kessler's next conversation with Burns, Burns asked Kessler why he changed his mind about killing Christopher, and Kessler said, "[b]ecause Stephanie didn't want him buried under the

ground . . . [b]ecause they had 18 years of child support and alimony payments." She also said that she did not "want to take a chance of something being linked back to her."

Kessler did not contact Burns again until February 16, 2006, when he called Burns to say that he and Stephanie were interested in having Christopher killed. Burns informed Agent Sullivan of the call, and Sullivan instructed Burns that if Kessler called him again, he should refer Kessler to "Bob," a fictitious army friend of Burns who would actually be Agent Sullivan. Near the end of February, Kessler called Burns again. As instructed, Burns told him that he had an old army buddy who owed Burns a favor and that the buddy, "Bob," would contact Kessler soon.

"Bob" (Agent Sullivan) initiated contact with Kessler. During his first conversation with Sullivan, Kessler freely spoke of murder, saying that he wanted it done quickly–by the end of the week–because the divorce would soon be final. Kessler told Sullivan that Stephanie had a couple of ideas about how to kill Christopher, which were the same two scenarios given to Burns but in greater detail. Kessler also proposed that Sullivan engage Christopher in a bar fight to violate his probation. Kessler said that the decision about whether to kill Christopher or simply assault him was Stephanie's decision because the whole situation was "essentially Stephanie's deal" as they were her kids and her husband. Kessler only wanted to do what Stephanie wanted.

Kessler and Sullivan engaged in a series of telephone calls, during which they discussed the murder. At some point, Stephanie and Kessler agreed to hire Sullivan to commit the murder, agreeing to pay him money out of their life insurance proceeds. The couple later said that they had changed their minds and had decided that they only wanted Sullivan to assault Christopher. They said that they wanted to make sure nothing could be traced to them, and Kessler indicated that Stephanie was "very cautious." When Sullivan became convinced the couple was not interested in contracting to kill Christopher, he turned the matter over to the local police and the FBI ended its investigation.

Six months later, however, in September 2006, Sullivan received another call from Burns. Kessler had once more contacted Burns and asked him to tell "Bob" that

he and Stephanie were now interested in killing Christopher. Burns said that the couple were willing to pay $1,000 so that there were no traces of the victim. Kessler also said that if "Bob" would not do it, then he had a friend who would do it for free.

Sullivan called Kessler on September 18, 2006. Kessler said to him, as he had to Burns, that they might need him, but that they had found a secondary hit man to take care of Christopher for free; Stephanie, Kessler said, did not want to leave a money trail. At this point, Sullivan became concerned that there may actually be a second, unknown hit man, so he contacted Christopher to warn him of the threat.

Throughout the next week, Burns continued to update Sullivan with any conversations he had with Kessler. Sullivan tried to keep the communication lines between him and Burns open, but at some point he began to think he had been "iced" out–removed from consideration in the plot. Kessler told Sullivan that Stephanie did not trust "Bob," but that she trusted the other hit man they were considering. Sullivan at that point offered to take care of the job for free as a favor to Burns.

On September 26, 2006, Kessler asked Burns to have "Bob" call him. He also told Burns that he was "not backing down this time." Sullivan called Kessler, and learned from Kessler that Christopher had been granted standard unsupervised visitation of his children, and that this had upset Stephanie. Kessler told Sullivan that Stephanie had said to "basically go ahead," but to make sure he does not get caught and to do it at a time when Stephanie and Kessler had an alibi. According to Kessler, both he and Stephanie were not changing their minds. Kessler confirmed that Stephanie was on board with the plan and that the couple would lend Sullivan a picture of Christopher from the children's photo album.

The couple now wanted Sullivan to make it look like a car accident and to murder both Christopher and his mother, who was added to the plan because, according to Kessler, "the very day [Christopher] dies, she's gonna be in a lawyer's office talking about visitation." Sullivan asked Kessler for some money in connection with the murder:

Sullivan:       Okay.  Um, You know, since we're dealing with two people, now, is there any way I can, uh, you know, I've been out to, uh, Ashtabula once to meet, ya, and, you know, coming out there again, and then, you know, being out there a third time to actually do this stuff, any way I can get, uh, you know, maybe a hundred bucks to help pay my gas or anything?

Kessler:        Um . . . Yeah, OK, we can do that.

Sullivan:       Okay.  I mean, do what you can, alright?  You know, it's not uh . . . I'm not  a millionaire, either.  I'm sure you guys aren't.  So you understand my pain.

Kessler:        Yeah, I know.  Um . . .

Sullivan:       So if you can get me the, uh, you know, the pictures and maybe some bucks, you know, to pay for my expenses and for taking care of, you know, Chris and Sherrie for you, you know, that would be great.

Kessler:        Okay, Yeah.  Um, should I do that? . . . I'll, should I do that?  Should I give that to him on Thursday when I see him?

Stephanie:      (UI)

Kessler:        Do you have any cash?  Yeah.  Stephanie said yeah, but it's gas money.  That's all it is.

Sullivan:       Okay, that's fine.

Kessler:        So . . . Um, yes, so I can get that to you Thursday.

The call continued with various plans regarding how to kill Christopher and his mother, and ended with Kessler stating that he "and Stephanie will give it some thought."  Sullivan told them to come up with a scenario that would be easy to pull off and to bring the pictures and "some cash for expenses" to a meeting they would have on the upcoming Thursday.  Kessler said they would "probably come up with a hundred" and that they would meet on Thursday.

Sullivan met with Kessler on Thursday, September 28, 2006 in the parking lot of Ashtabula County Medical Center.  Kessler stated that Stephanie had developed the murder plan: Sullivan was to hide outside Christopher's house and surprise him by hitting him on the head with a blackjack, pour whiskey down his throat, and then place him on the railroad tracks near their house.  Kessler gave Sullivan very specific

instructions to make sure that Christopher's head was laid face first on the tracks so that, when the train hit him, it would obliterate his skull and be impossible to tell that a blow had been struck to his head.  Kessler showed Sullivan the photographs of Christopher, but would not let him keep the pictures.  Kessler gave Sullivan $100 to take care of Sullivan's expenses for killing Christopher and framing his mother so that she would not be able to obtain custody of the children.  Kessler told Sullivan where Christopher worked, gave him directions on how to get there, and told him when Christopher's work schedule would change.

Agent Sullivan drove to Stephanie's house on October 3, 2006 and said he needed to see a photograph of Christopher again.  Stephanie showed Sullivan a picture of Christopher and told him that Christopher's appearance had not changed.  Sullivan also asked if it had been Stephanie's idea to put Christopher on the railroad tracks and, when she acknowledged that it was, Sullivan left.

The next morning, Sullivan called Kessler's cell phone and told him that the murder was completed according to their plan.  Kessler asked some questions about how it was completed and thanked him several times.  Sullivan asked him: "This is what you and Stephanie wanted, correct?"  Kessler acknowledged that it was.

## B.     Procedural Background

On December 5, 2006, a federal grand jury in the Northern District of Ohio returned a two-count indictment against Alan Kessler and Defendant, charging them with two violations of 18 U.S.C. §§ 1958 and 2:  (1) conspiracy to cause someone to travel in interstate commerce with the intent that a murder be committed in consideration for payment of money (Count 1); and (2) using a facility of interstate commerce with the intent that a murder be committed in consideration for payment of money (Count 2).  Kessler pleaded guilty and was sentenced to serve sixty-seven months imprisonment.

Defendant pleaded not guilty, and a jury trial commenced on June 27, 2006.  The jury returned a verdict of not guilty on Count 1 of the indictment and a verdict of guilty on Count 2 of the indictment.  The district court denied Defendant's motion for judgment

of acquittal under Federal Rule of Criminal Procedure 29 on October 15, 2007. The district court also denied Defendant's motion for reconsideration. Defendant was then sentenced to forty-eight months imprisonment and three years of supervised release. Defendant now appeals.

## II. ANALYSIS

### A.    Standard of Review

We review the district court's denial of a motion for acquittal based on sufficiency of the evidence *de novo*. *United States v. Mabry*, 518 F.3d 442, 447-48 (6th Cir. 2008). The district court's denial must be affirmed "if the evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt." *Id.* at 448 (quoting *United States v. Canan*, 48 F.3d 954, 962 (6th Cir. 1995)). "The appellate court must view all evidence and resolve all reasonable inferences in favor of the government." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Searan*, 259 F.3d 434, 441 (6th Cir. 2001)). In doing so, however, the court cannot independently weigh the evidence nor substitute its judgment for that of the jury. *Id.* (citations omitted). "This standard is a great obstacle to overcome, and presents the appellant in a criminal case with a very heavy burden." *Hughes*, 505 F.3d at 592 (citing *United States v. Winkle*, 477 F.3d 407, 413 (6th Cir. 2007) and *United States v. Jackson*, 473 F.3d 660, 669 (6th Cir. 2007)).

### B.    Discussion

The federal murder-for-hire statute provides:

Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both; and if

personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.

18 U.S.C. § 1958(a).    Thus, in order to obtain a conviction, the Government was required to prove that Defendant (1) caused a person to use any facility of interstate commerce, (2) with the intent that a murder be committed, in violation of the laws of Ohio, and (3) that the murder was to be committed as consideration for the promise or agreement to pay anything of pecuniary value.  The only element which Defendant attacks in this appeal is whether the Government established beyond a reasonable doubt that Defendant had promised or agreed to pay anything of pecuniary value as consideration for "Bob" committing the murder.  Under § 1958, "anything of pecuniary value" means "anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage."  18 U.S.C. § 1958(b)(1).

Defendant argues that there was insufficient evidence to convict her because, even viewed in a light most favorable to the Government, the evidence could only establish a $100 payment to cover "expenses," and therefore the $100 does not constitute consideration or payment for a murder.  Defendant further argues that "expenses" cannot meet the standard for "pecuniary value" as a matter of law.  We disagree.

*1. A rational jury could find that the $100 was payment for the murder, and not just to cover expenses*

The evidence is sufficient to support a finding that Defendant agreed to pay Sullivan $100, not just to cover expenses, but also as consideration for the murder of her estranged husband.  In preliminary discussions between Kessler and "Bob," Kessler affirmatively agreed to hire Sullivan to commit the murder, agreeing to pay him money out of Defendant's life insurance proceeds.  Although the couple later wanted Christopher assaulted, not murdered, Kessler indicated it was because they wanted to make sure nothing could be traced to them and that Defendant was "very cautious."  Six months later, in September 2006, Burns told Sullivan that the couple was willing to pay $1,000 so that there were no traces of Christopher.  When Sullivan followed up with

Kessler, Kessler told Sullivan that Defendant did not want to leave a money trail and that they had found a secondary hit man who would perform the murder for free. In the recorded conversation between Sullivan and Kessler, Sullivan asked if he could get $100 dollars "to help pay [his] gas or anything," and Kessler agreed. Although Kessler indicated that Defendant had said, "it's gas money," in light of the substantial history of negotiating this murder, the jury was within the realm of reason to conclude that this $100 was payment for the murder. The jury could reasonably conclude that Defendant's insistence that the payment was "gas money" was some sort of misguided attempt at not creating the "money trail" she feared. (*Id.*)  Moreover, Sullivan stated in his conversation with Kessler that he wanted "some bucks" to "pay for my expenses *and for taking care of, you know, Chris and Sherrie* [Christopher's mother]. . ."   (*Id.*) Whatever label Defendant applied to the money is not dispositive of the question of whether the $100 was consideration for the murder of her estranged husband.

Given the record evidence, a rational jury could, and indeed did, find that the $100 payment was intended as consideration for the murder of Christopher. We must "resolve all reasonable inferences in favor of the government." *Hughes*, 505 F.3d at 592 (citations omitted). It is certainly reasonable to infer that Defendant intended that the $100 payment be made in consideration for the murder, and the jury could similarly reasonably reject her insistence that the $100 was for "gas money" only. Accordingly, we reject Defendant's argument that no rational juror could find her guilty beyond a reasonable doubt.

*2.  Money to cover expenses qualifies as payment of something of pecuniary value*

Further, even if the Government could prove only that the $100 payment was for gas money, we do not agree that payment for expenses related to a murder contract cannot constitute "consideration" under 18 U.S.C. § 1958.

The murder-for-hire statute requires that the murder or intended murder be committed "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value . . . ." 18 U.S.C. § 1958(a). We have not addressed directly the consideration element of murder-for-hire, but other circuits have

held that the statute requires "a mutual understanding that something of value will be exchanged for committing a murder." *United States v. Wicklund*, 114 F.3d 151, 154 (10th Cir. 1997). "Consideration" in the law is, principally, "[t]he inducement to a contract." BLACK'S LAW DICTIONARY 306 (6th ed. 1991). State courts typically find that contractual consideration exists where there is "a benefit on one side, or a detriment suffered, or service done on the other." *Plastray Corp. v. Cole,* 37 N.W.2d 162, 165 (Mich. 1949) (citation omitted); *see also Wood v. Lowery*, 238 S.W.3d 747, 755-756 (Tenn. Ct. App. 2007) ("The court in *University of Chattanooga v. Stansberry*, 9 Tenn. App. 341, 343 (1928), defined consideration as 'either a benefit to the maker of the promise or a detriment to, or obligation upon, the promise[e].'"); *Costanzo v. Nationwide Mut. Ins. Co.*, 832 N.E.2d 71, 79 (Ohio Ct. App. 2005) ("In Ohio, consideration is either a benefit to the promisor or a detriment to the promisee.") (citations and quotations omitted); *Huff Contracting v. Sark*, 12 S.W.3d 704, 707 (Ky. Ct. App. 2000) ("[T]he term "consideration" is . . . defined [as] '[a] benefit to the party promising, or a loss or detriment to the party to whom the promise is made.'") (citing *Phillips v. Phillips*, 171 S.W.2d 458, 464 (Ky. Ct. App. 1943)). The plain meaning of § 1958's "language undeniably contemplates a quid-pro-quo (or at least the promise of such) between the parties to the transaction, the murderer and the solicitor." *United States v. Hernandez*, 141 F.3d 1042, 1057 (11th Cir. 1998); *see also United States v. Hardwick,* 523 F.3d 94, 99-100 (2d Cir. 2008) (requiring *quid pro quo*, bargained-for exchange); *United States v. Richeson*, 338 F.3d 653, 657 (7th Cir. 2003) (same). We agree with our sister circuits and hold that the consideration element of the statute requires a *quid pro quo* between the parties of something of pecuniary value.

We find further that the payment of a mere $100, even if it were offered as having been related only to the "expenses" of the receiving party, was still paid as a *quid pro quo* for "Bob's" agreement to murder Christopher. Everyone has "expenses" of various kinds and, as we have earlier observed, "money is fungible." *In re Gray Elec. Co.*, No. 96-2518, 1998 WL 109989, *2 (6th Cir. Mar. 4, 1998); *cf. Sabri v. United States,* 541 U.S. 600, 605-06 (2004) ("It is true . . . that not every bribe or kickback . . . will . . . show up in the guise of a *quid pro quo* for some dereliction in spending a federal

grant.  But . . . [m]oney is fungible . . . .  Liquidity is not a financial term for nothing; money can be drained off here because a federal grant is pouring in there.") (citations omitted).

Defendant relies on *United States v. Chong*, 419 F.3d 1076 (9th Cir. 2005), in which the Ninth Circuit held that "[m]oney to cover incidental expenses rather than as compensation for carrying out the murder-for-hire does not meet § 1958's requirements."  *Id.* at 1083.  While this language, in isolation, appears to support Defendant's position, the facts in *Chong* are readily distinguishable from the instant case.  In *Chong*, the evidence at trial could not establish that anyone was given money in exchange for carrying out a murder.  There was no doubt that money was given, but it was equally clear that it was not for a murder as murder had not yet been discussed.  The Government was able to prove only that a person was given $100 to perform a "dangerous job" without knowing that the true character of the job was to perform a murder.  Under those facts, the Ninth Circuit stated:

> As to the Bike Ming assignment, however, the evidence shows only that Casey volunteered for a dangerous assignment and wound up getting some walking-around money in the course of traveling to Boston. Money to cover incidental expenses rather than as compensation for carrying out the murder-for-hire does not meet § 1958's requirements. *See* [*United States v. Ritter*, 989 F.2d 318, 321-22 (9th Cir. 1993)] (holding that although defendant was paid $70 to build a bomb, the money was not payment for commission of the murder).  On the record here, we hold that the jury had insufficient evidence to find that Casey agreed to travel to Boston to kill Bike Ming in exchange for something of pecuniary value offered by Chong or his co-conspirators.

*Id.* at 1083-84 (footnote omitted).  In view of the circumstances surrounding the payment in *Chong*, we do not interpret *Chong* as creating a bright-line rule that a payment of "incidental expenses" can never constitute consideration for a murder for purposes of § 1958.  Instead, *Chong* establishes only that the payment must be made *in consideration for* the act of murder.  This standard cannot be met where the future hitman is unaware that he will commit murder at the time he receives payment.  *See id.*

In this case, however, there was sufficient evidence to support the jury's conclusion that the $100 was given to Sullivan specifically connected to and as consideration for him to perform the murder. The nature of the job had been made amply clear on several occasions. The fact that Defendant called it "gas money" does not detract from the evidence that she agreed to pay that money as a form of consideration for Sullivan to murder Christopher.[1] While $100 is not a substantial *amount* of money, it is, nonetheless, money. To meet the requirements of § 1958 the "[p]ayment need only be a quid pro quo contractual arrangement between the hiring and hired parties." *United States v. Washington*, 318 F.3d 845, 854 (8th Cir. 2003) (citation omitted) (holding that two and a half ounces of heroin was sufficient to meet the requirements of § 1958(b)). The cash given to Sullivan fully meets the definition of "anything of pecuniary value" as it is something "of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage." 18 U.S.C. § 1958(b)(1).

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** judgment of conviction and the district court's denial of the Rule 29 motion.

---

[1] Defendant additionally relies on an unpublished Third Circuit case, which is also distinguishable from the facts of this case. In *United States v. Black*, 38 F. App'x 767, 768 (3d Cir. 2002), the Third Circuit did not hold, as Defendant suggests, that the "mailing of $100 for expenses satisfied the *interstate commerce* element of § 1958, but the pecuniary value element of § 1958 was proven by separate payment in cocaine, not the $100 for expenses." (Def.'s Final Br. at 23.) Instead, in *Black*, the defendant argued on appeal that "the consideration element was presented to the jury on alternative theories, money or cocaine, and that one theory was invalid: cocaine is not covered by the statutory definition of consideration and thus cannot be deemed 'a thing of pecuniary value as required by 18 U.S.C. [§] 1958." *Black,* 38 F. App'x at 768. The Third Circuit rejected this argument and found that the language of the statute was "broad enough to include cocaine. Cocaine qualifies as 'anything else the primary significance of which is economic advantage' because it is something that is bought and sold." *Id.* (quoting § 1958).