[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 28, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-15900
Non-Argument Calendar

_____

D. C. Docket No. 08-00018-CR-5--RS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVRON D. DADAMURATOV,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(July 28, 2009)

Before CARNES, HULL and WILSON, Circuit Judges.

PER CURIAM:

Davron D. Dadamuratov appeals his conviction for copyright infringement

of motion pictures, in violation of 17 U.S.C. § 506(a)(1) and 18 U.S.C. § 2319(a) and (b). After review, we affirm.

## I. BACKGROUND

Dadamuratov was charged with knowingly and willfully reproducing and distributing more than 10 copies of motion pictures without authorization from the copyright holders, in violation of 17 U.S.C. § 506(a)(1) and 18 U.S.C. § 2319(a) and (b). The government contended that Dadumartov downloaded movies from the Internet, copied them to discs, and rented the movies to customers at the Moscow Grocery and Internet Café ("Moscow Grocery"), the grocery store he managed.

### A. Trial Evidence

Law enforcement became aware of the Moscow Grocery's movie rental business on September 2, 2007. Customer Vahe Arshakyan demanded a refund from Olga Zubova, a Moscow Grocery store clerk, because the four DVD movies that he rented would not play in his DVD player. Zubova checked the DVDs in the store's DVD player and found that they all played. Zubova told Arshakyan that she could exchange the DVDs for others in the store but could not give him a refund. Arshakyan yelled, called Zubova names, and pushed her. Zubova tried to call 911 from the store's phone but Arshakyan pulled the phone cord from the wall.

2

Zubova called 911 from her cell phone.

Sergeant Clayton Jordan, an officer with the Panama City Beach Police Department, responded to Zubova's 911 call. As Officer Jordan was speaking to Zubova, Dadamuratov approached them and introduced himself to Officer Jordan as the store owner. Dadamuratov explained that the Moscow Grocery rented movies, sold international groceries and phone cards, and offered Internet access. Zubova and Dadamuratov showed Officer Jordan one of the DVDs that was at issue in the dispute with Arshakyan. The DVD case appeared to be for an old Russian war movie and had Russian writing on it. Zubova and Dadamuratov said the DVD was the movie Die Hard IV, which was still in theaters at the time. Zubova played the DVD for Officer Jordan in the DVD player at the store counter.

Officer Jordan testified that Dadamuratov said he "downloads the movies already dubbed over into Russian dialogue from the computer. Then he rents them out." Dadamuratov showed Officer Jordan the log book that he used to keep track of DVD rentals and said that he rented the movies for $2 a day.

Officer Jordan brought Zubova and Dadamuratov to his patrol car to record interviews with both of them using a micro-cassette recorder. Officer Jordan went through the same questions that he had asked them inside the store. During the interview, Dadamuratov told Officer Jordan that he had owned the store since 2004

3

with another person who was no longer around and that Dadamuratov "runs the show." Dadamuratov also said that he personally rented the movies to Arshakyan.

Officer Jordan brought the micro-cassettes that contained the interviews of Zubova and Dadamuratov to the police station and gave them to Jessica Bruhmuller, the police department's investigative secretary, for transcription. At trial, Officer Jordan testified that the transcripts of Zubova's and Dadamuratov's interviews accurately reflected their conversations. Bruhmuller testified that she transcribed the two interviews and that the transcripts were "word for word" what she was able to hear and understand from the recordings.[1]

Before the government published the transcript of Dadamuratov's interview, the district court explained to the jury that the government contended that the transcript reflected an interview between Dadamuratov and Officer Jordan. The district court instructed the jury, "If you determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent." Bruhmuller read the transcript to the jury.

According to the transcript, when Officer Jordan asked Dadamuratov what his position was at the store, Dadamuratov responded that he was one of the

---

[1]As discussed later, after the transcripts were prepared, law enforcement officers accidentally destroyed the recording of the interviews as they attempted to transfer the recording from a micro-cassette to a digital format. The district court overruled Dadamuratov's objection to the admission of the transcript of his interview with Officer Jordan as evidence.

owners of Moscow Grocery, along with a man named Yusup, since 2004 and that Dadamuratov was "the one running the show now." Dadamuratov told Officer Jordan that, the day before, he had rented four movies—two Russian movies and two American movies that had been translated into Russian—to "Vahe." When Officer Jordan asked where Dadamuratov got the movies, Dadamuratov responded, "Most of them we download from the computer." Dadamuratov said he had been downloading movies, burning them to DVDs, and renting them "since we opened." When asked where he downloaded the movies, Dadamuratov said, "I don't do it. I had a guy who was doing from [a] free download website."

Christopher Murphy, a special agent with Immigration and Customs Enforcement, testified that he became aware of the Moscow Grocery's rental of potential copyrighted material while working on Arshakyan's case. Special Agent Murphy investigated further and obtained a federal search warrant for the Moscow Grocery. In executing the search of the Moscow Grocery on October 5, 2007, law enforcement officers seized: eight computers; three hard drives; several DVD and VHS players and recorders that could record from a VHS tape or DVD onto a DVD; 562 VHS tapes; 897 DVDs; and stacks of blank, recordable DVDs and DVD covers. The officers also seized a logbook containing dates, renters' names, and movie titles, which documented rentals from January 2005 through October 2007.

5

Special Agent Murphy testified that the movies that were being rented by the Moscow Grocery did not resemble movies from other movie rental stores like Blockbuster because there was no art work on them. Some of the discs had movies on each side of a recordable DVD.

Special Agent Murphy and other officers watched all the movies to determine which were American and were created during the 180-day period charged in the indictment. The DVDs seized from the Moscow Grocery were distinct from DVD rentals at ordinary movie rental stores in that (1) several did not contain FBI warnings at the beginning; (2) instead of playing previews of other movies as rental videos usually do, the opening scene on several of the DVDs was an advertisement for the Moscow Grocery; (3) they did not have credits at the end; (4) some were filmed by individuals with video cameras in a movie theater; and (5) some of the movies were screening versions from the Motion Picture Association that contained a warning to the public that they should not be viewing the copyrighted film. In addition, Special Agent Murphy stated that several documents filed with the Florida Department of State listed Dadamuratov as the owner or managing member of the Moscow Grocery.

Zubova testified that she had known Dadamuratov and Yusup Kabuljanov, the other owner of the Moscow Grocery, for approximately four years. In

September or October 2006, Kabuljanov left the United States and has not returned since. Zubova started working part-time at the Moscow Grocery and kept records of groceries. In December 2006, Dadamuratov hired her as a full-time employee and trained her. Zubova testified that Dadamuratov managed the Moscow Grocery after Kabuljanov left the country.

Zubova performed duties in all parts of the Moscow Grocery's business, including movie rentals. Zubova testified that Dadamuratov gave her new movies to add to the other rentals and that she labeled and organized the rental movies in a book so it would be easier for customers to browse them.

On cross-examination, defense counsel asked Zubova about her April 2008 interview with Special Agent Murphy that occurred after Dadamuratov was arrested. When asked if she requested a lawyer during that interview, Zubova responded that there was one question that she did not understand and that she said she would not answer and needed a lawyer. When asked if she requested a lawyer twice during the interview, Zubova said that "it was long ago, and I was quite scared, so maybe." Defense counsel asked if she was afraid because she was being questioned by law enforcement. Zubova responded, "Everything happened all of a sudden, and I didn't expect anything would happen to [Dadamuratov]."

Defense counsel asked to play a recording of Zubova's April 2008

interview. The government objected that the tape was hearsay, unless it was being used to impeach Zubova. Defense counsel stated that she intended to use the interview to impeach Zubova's testimony that Dadamuratov gave her the DVDs and to show that the interviewing agent was suggesting answers to her. The government requested that the district court admit the entire recording because Zubova also stated during the interview that Dadamuratov gave her the tapes. The district court told defense counsel to question Zubova about the responses she gave during that interview and then play "the part that is an inconsistent statement," but stated that "we are not gonna play the whole thing."

Defense counsel resumed her questioning of Zubova and asked her several questions about her answers in the April 2008 interview regarding who gave her the DVDs and who ran the store. The district court instructed defense counsel to review the recording during the court's lunch break to find any specific inconsistent statements that could be used for impeachment purposes. The court was in recess for lunch for one hour and twenty minutes.

After lunch, the government briefly presented testimony from a few other witnesses before resting its case. Dadamuratov moved for a judgment of acquittal on the grounds that the government had failed to establish, inter alia, that he made the counterfeit DVDs or otherwise had any knowledge of what was on them. The

8

district court denied the motion.

Defense counsel stated that Dadamuratov would not present any evidence in his defense but reiterated his argument that he should be permitted to play Zubova's April 2008 interview for the jury to show that Zubova was intimidated by the interviewing officer. Defense counsel stated that she was unable to review the recording of the interview to find the inconsistent portions to be used for impeachment purposes because her CD player would not play the disc. The district court again stated that it would not allow the entire 30-minute interview to be played and that the interview was admissible for impeachment purposes only. The district court also noted that defense counsel could have retrieved another CD player but failed to do so.

The jury found Dadamuratov guilty.

After the jury's verdict, Dadamuratov renewed his motion for judgment of acquittal on the ground that the government had failed to establish that he willfully committed a copyright violation. Dadamuratov alternatively moved for a new trial based on the government's use of the transcript of his interview with Officer Jordan and the district court's refusal to permit him to play Zubova's taped statement for the jury. The district court denied his motions.

The district court sentenced Dadamuratov to 24 months' imprisonment.

Dadamuratov appeals his conviction.

## II.  BACKGROUND

A.    **Sufficiency of the Evidence**

It is a criminal offense to (1) willfully (2) infringe a copyright, if (3) "the infringement was committed -- (A) for purposes of commercial advantage or private financial gain; (B) by the reproduction or distribution . . . during any 180-day period, of 1 or more copies . . . of 1 or more copyrighted works, which have a total retail value of more than $1,000; or (C) by the distribution of a work being prepared for commercial distribution . . . , if such person knew or should have known that the work was intended for commercial distribution." 17 U.S.C. § 506(a); see also United States v. Goss, 803 F.2d 638, 642 (11th Cir. 1986). Dadamuratov argues that the evidence was insufficient to show that he willfully infringed a copyright.[2]

Here, the evidence showed that Dadamuratov was one of the owners of the Moscow Grocery and had been managing the store since Kabuljanov left the country in 2006.  In fact, Dadamuratov introduced himself to Officer Jordan as the

---

[2]We review de novo a claim of insufficiency of the evidence.  United States v. Nolan, 223 F.3d 1311, 1314 (11th Cir. 2000).  We view the evidence in the light most favorable to the government and will affirm a conviction if, based on this evidence, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. (quotation marks omitted).

owner of the Moscow Grocery and told Jordan that he was "the one running the show now." In addition, Zubova testified that Dadamuratov hired and trained her. While Dadamuratov argues that the evidence showed that Kabuljanov was running the Moscow Grocery from out of the country through Zubova, it was within the province of the jury to believe Dadamuratov's own statements that he was the owner and operator of the Moscow Grocery. United States v. Thompson, 473 F.3d 1137, 1142 (11th Cir. 2006) ("The jury gets to make any credibility choices, and we will assume that they made them all in the way that supports the verdict."); United States v. Hernandez, 141 F.3d 1042, 1052 (11th Cir. 1998) ("It is emphatically not within the province of an appellate court to reweigh the evidence and the credibility of the witnesses at trial.").

Dadamuratov also admitted to Officer Jordan that the Moscow Grocery downloads movies for free from the Internet, burns them to DVDs, and rents them to customers. According to Jordan, Dadamuratov said he "downloads the movies already dubbed over into Russian dialogue from the computer. Then he rents them out." When asked later where he got the movies, Dadamuratov responded, "Most of them we download from the computer." Dadamuratov said he had a guy who downloaded the movies from a free website and that the Moscow Grocery had been downloading movies, burning them to DVDs, and renting them since it

11

opened. Law enforcement officers seized electronic equipment at the Moscow Grocery that revealed the extensive nature of this operation, including multiple computers, hard drives, and machines to record from a VHS tape or DVD onto a DVD; hundreds of VHS tapes and DVDs; and stacks of blank, recordable DVDs and DVD covers.[3]

There was evidence from which the jury reasonably could have concluded that Dadamuratov was an active participant in the illegal movie rental enterprise at the Moscow Grocery. Zubova testified that Dadamuratov was the person who gave her new movies to catalog with the other rentals. In addition, Dadamuratov admitted that he personally rented four movies to Arshakyan. One of these movies was a recordable DVD copy of the movie Die Hard IV, which was still playing in theaters at the time, that was rented in a DVD case that appeared to be from an old Russian war movie.

Finally, there was evidence that the movies being rented by the Moscow Grocery were not authorized copies. Specifically, the officers who seized and viewed the DVDs observed that some of the DVDs (1) were on recordable DVD

---

[3]Dadamuratov argues that the fact that none of this equipment was removed from the Moscow Grocery between the time of the incident with Arshakyan on September 2, 2007 and the search on October 2, 2007 shows that Dadamuratov lacked knowledge that there was any illegal material in the Moscow Grocery. However, the jury reasonably could have concluded that Dadamuratov did not remove any of the equipment because he believed that the police's investigation was focused on Arshakyan's alleged battery, not on the Moscow Grocery's operations.

discs with no art work, (2) had movies on each side of a recordable DVD, (3) lacked FBI warnings, movie previews, and credits, (4) appeared to be filmed by an individual with a video camera in a movie theater, and (5) were screening versions from the Motion Picture Association that contained a warning that they should not be viewed by the public.

The totality of this evidence, with all reasonable inferences being made in favor of the jury's verdict, supports a finding that Dadamuratov was the owner and manager of a store that operated an enterprise of reproducing and distributing copies of copyrighted movies and that he was personally involved in this movie rental enterprise. The evidence, while circumstantial, supports a finding that Dadamuratov was aware that the downloaded movies on the DVDs that were being produced and distributed by the Moscow Grocery were copyrighted material.

## B. Admission of the Transcript of Dadamuratov's Interview

Dadamuratov argues that the district court erred in denying him a new trial based on the admission of the transcript of his interview with Officer Jordan after the original recording of the interview was destroyed.[4] Before trial, the government filed a Notice of Accidental Destruction of Evidence regarding a recording of an interview of Dadamuratov by local law enforcement officers that

---

[4]We review a district court's denial of a motion for a new trial for an abuse of discretion. United States v. Perez-Oliveros, 479 F.3d 779, 782 (11th Cir. 2007).

was taken while they were investigating a possible theft and battery at the Moscow Grocery. After the interview was transcribed, other law enforcement officers attempted to transfer the recording to a digital format, but accidentally taped over the recording. Dadumuratov objected to the admission of the transcript at trial on several grounds. The district court rejected each of Dadamuratov's arguments and admitted the transcript in lieu of the recording.

On appeal, Dadamuratov raises three arguments, which we address in turn. First, Dadamuratov argues that the transcript should not have been admitted as evidence because it was not the best evidence of the conversation. "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules . . . ." Fed. R. Evid. 1002. However, "[t]he original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if . . . [a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith." Fed. R. Evid. 1004; see also United States v. Ross, 33 F.3d 1507, 1513 (11th Cir. 1994) (rejecting defendant's best-evidence challenge to the district court's decision to admit transcripts of destroyed recordings of conversations between co-conspirators and stating that "[o]nce the terms of Rule 1004 are satisfied, the party seeking to prove the contents of the recording—here, the

14

government—may do so by any kind of secondary evidence").

Here, the district court properly admitted the transcript as secondary evidence of the destroyed recording of the interview between Officer Jordan and Dadamuratov under Federal Rule of Evidence 1004. In its pretrial order, the district court found that the destruction of the recordings was accidental and not in bad faith because (1) the interview was voluntarily initiated by Dadamuratov during the course of the investigation of the incident with Arshakyan and thus was not made with the purpose of implicating Dadamuratov in any crime; (2) the interview was transcribed before the search warrant of the Moscow Grocery was executed and before Dadamuratov was indicted; and (3) the officers who erased the recordings were not the same officers who interviewed Dadamuratov or who transcribed the recordings. In light of these findings, we cannot say that the district court abused its discretion.

Second, Dadamuratov argues that the transcript was inadmissible hearsay and that it would have been more appropriate to have a law enforcement officer testify as to the contents of the conversation. We reject this argument because the statements in the transcript were admissions by Dadamuratov, a party-opponent, and thus were not hearsay when offered as evidence against him. See Fed. R. Evid. 801(d)(2)(A); Ross, 33 F.3d at 1514 n.9.

15

Finally, Dadamuratov objects to the authenticity of the transcript. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). Officer Jordan testified that the transcript accurately reflected his conversation with Dadamuratov. Also, Jessica Bruhmuller, the police department's investigative secretary, testified that she transcribed the interview and that the transcript was "word for word" what she heard on the recording. We are satisfied from this evidence that the district court properly determined that the transcript was authenticated.

For all these reasons, we conclude that the district court did not err in denying Dadamuratov's motion for a new trial based on the admission of the transcript of the interview between Officer Jordan and Dadamuratov.

## C. Refusal to Play the Recording of the Entire Zubova Interview

Dadamuratov also argues that the district court erred in denying him a new trial based on the court's refusal to allow him to play the entire recording of Zubova's April 2008 interview.[5] Dadamuratov argues that the district court denied him his Fifth and Sixth Amendment rights to a fair trial and theory of defense because he was unable to establish how Zubova's answers were coaxed by Special

---

[5]As stated earlier, we review a district court's denial of a motion for a new trial for an abuse of discretion. Perez-Oliveros, 479 F.3d at 782.

16

Agent Murphy.

We find no abuse of discretion by the district court in this regard, either. Dadamuratov insisted that he needed to play the entire interview for the jury in order to show Zubova's motivation to testify against him. However, Dadamuratov had the opportunity on cross-examination to inquire if Zubova had any bias or motive to testify falsely against Dadamuratov or if her answers in the interview were improperly suggested by the interviewing officer, and he was unsuccessful in both regards.

Furthermore, while the district court would not allow Dadamuratov to play the entire interview for the jury, it advised defense counsel that she could use specific portions of the interview that were inconsistent with Zubova's trial testimony for impeachment. The district court instructed defense counsel to ask Zubova questions to lay the foundation for impeachment and, during the court's lunch break, to find the specific portions of Zubova's testimony that defense counsel would use for impeachment. Defense counsel failed to locate these portions because her CD player was not compatible with the disc. Instead of locating another machine to find the isolated portions of the interview to use for impeachment, as the district court instructed, defense counsel insisted that Dadamuratov should be allowed to play the entire 30-minute interview based on

17

vague allegations of bias and improper questioning. Defense counsel, however, never identified any specific part of the interview that reflected bias by Zubova or improper questioning by Special Agent Murphy. Thus, we cannot say the district court abused its broad discretion in denying Dadamuratov a new trial based on its ruling that Dadamuratov could not play for the jury the entire recording of Zubova's April 2008 interview.

### III. CONCLUSION

For all the reasons above, we affirm Dadamuratov's conviction.

**AFFIRMED.**